**Irwin STERN, Plaintiff–Appellant,**

v.

**TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, Defendant–Appellee.**

**No. 1626, Docket 95–9137.**

United States Court of Appeals, Second Circuit.

Argued May 24, 1996.

Decided Dec. 12, 1997.

York City, on the brief), for Defendant–Appellee.

Before: WINTER, Chief Judge, KEARSE and CALABRESI, Circuit Judges.

Judge Calabresi dissents, in a separate opinion.

KEARSE, Circuit Judge:

Plaintiff Irwin Stern appeals from a final judgment entered in the United States District Court for the Southern District of New York, Harold Baer, Jr., *Judge*, dismissing his complaint alleging that defendant Trustees of Columbia University ("Columbia" or the "University") denied him a requested position because of his national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (1994). The district court granted the University's motion for summary judgment dismissing the complaint on the ground that, though Stern had presented sufficient evidence to establish a prima facie case, the court would not second-guess the nondiscriminatory reason proffered by the University for its selection of another candidate. On appeal, Stern contends that summary judgment was improper because there were genuine issues of fact to be tried. For the reasons that follow, we agree, and we therefore vacate the judgment and remand for further proceedings.

## I. BACKGROUND

The present controversy centers on the position of Director of the Spanish Language Program ("Language Program" or "Program") in the University's Department of Spanish and Portuguese (the "Department"). Through the Program, the Department principally provided instruction in the Spanish language to some 750 undergraduate and graduate students in approximately 45 sections of 12 elementary and intermediate courses each semester, taught by approximately 25 teaching assistants.

Roy Karlin, New York City (Shapiro, Beilly, Rosenberg, Albert & Fox, New York City, on the brief), for Plaintiff–Appellant.

Mark L. Goldstein, New York City (Andrea H. Stempel, Goldstein & Morris, New

Stern, a white American male of Eastern European origin, was acting director of the Program in 1991–1993. In 1992, when it was decided that a full-time director should be

appointed for the academic year beginning in 1993, Stern applied for the position. The University, which had adopted an affirmative action plan pursuant to which it sought out qualified women and minority candidates, appointed as director Augustus Puleo, an American male of Hispanic descent. Stern contends that despite his own extremely strong credentials and recommendations, he was never afforded a genuine opportunity to compete with candidates from the University's preferred groups.

Preliminarily, we note that this appeal has arrived in this Court with the entire record sealed. We see no basis for the sealing of an entire record such as this, particularly in the context of a motion for summary judgment that was granted. *See Joy v. North,* 692 F.2d 880, 893 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). In response to an inquiry at oral argument, the University sent this Court a letter specifying certain documents that it deemed confidential and wished to remain sealed. Accordingly, with the exception of the documents specified in that letter, the record is hereby unsealed. The University may move in the district court for a determination of which, if any, of the documents specified in its letter should remain sealed. That determination should be made in accordance with the test set out in *United States v. Amodeo,* 71 F.3d 1044 (2d Cir.1995).

Taken in the light most favorable to Stern, as the party opposing summary judgment, the record includes the following.

### A. Stern's Qualifications

Stern received his Ph.D. from the City University of New York in 1972 and was hired by Columbia in 1978 for a part-time position in the Department. In that position, he taught Spanish and Portuguese, helped to develop the Spanish Program for medical students at the University's College of Physicians and Surgeons, and ran the Department's summer language program. For this work, Stern received high praise for both his teaching and his administrative abilities. In 1989, Stern was named director of the University's College of Physicians and Surgeons Spanish Program.

By 1992, Stern had some 25 years' experience in teaching college-level courses in Spanish and Portuguese language and literature. He had served on the editorial boards of several professional journals, had edited more than 40 college-level textbooks on Spanish language and literature, and had published his own Spanish and Portuguese grammar textbooks and scholarly works.

### B. The University's Affirmative Action Plan

Throughout the relevant period, it was the University's policy that faculty was to be hired without regard to invidious factors such as race, color, religion, age, or national origin. The University had an affirmative action plan (the "Plan"), applicable to all of its schools and departments (collectively "departments"), which required that all academic appointments to full-time positions be made after "a wide search for candidates, with special efforts made to locate women and minority group candidates[,] and ... a fair, impartial review and judgment of all applications." (1992 Affirmative Action Plan at 7.) Once promising female and minority candidates were identified, however, all applicants were to be evaluated by the same standards. (See Affidavit of Martin Meisel, former University Vice President, dated August 21, 1995, ¶ 24 ("The Plan does not ... permit ... the use of different or lower standards in judging minority and female candidates. Instead, it urges that special efforts be taken to identify promising minority and female candidates. Once they are identified, however, they are judged by the same rigorous standards applied to white males.").)

The Plan also recognized that "the process of faculty recruitment and development inherently involves the application of judgmental criteria, and that the responsibility for applying these criteria must rest primarily with the faculties themselves." (1992 Affirmative Action Plan at 6.) The Plan required each department to establish its own search and evaluation procedures consistent with the University's policies and goals. The Department of Spanish and Portuguese had established such procedures, which required its

Executive Committee, comprising all tenured faculty members in the Department, initially to define the position available and vote on whether to initiate a search for a full-time nontenured faculty member. Once an affirmative vote was taken, the Department's Chair would draft an advertisement to be submitted to the University's Vice President for Arts and Sciences for approval. All applications submitted in response to the advertisement would then be read by the Department's search committee, with the most promising applications being reviewed by the Executive Committee and non-Department persons such as adjunct faculty members and members of the Spanish Department at Barnard College ("Barnard"). The strongest candidates would then be invited to interview with the faculty and, on occasion, to present a talk at the University to Department faculty, graduate students, or others. The final decision as to each candidate was to be made by the Department's Executive Committee, with input from a representative from Barnard.

## C. *The Directorship of the Spanish Language Program*

In mid–1991, the then-Director of the Spanish Language Program, David Barnwell, resigned. Barnwell recommended that Stern be his successor; the Department's faculty unanimously concurred. The University's affirmative action plan permitted a department to fill a position following a limited search, or no search, in certain circumstances, such as when a position was left open due to an unforeseen occurrence. In those circumstances, the Plan required the department to seek from the University's Provost a waiver of the Plan's affirmative-action search requirements. In the wake of Barnwell's unanticipated resignation, the Department's Chair recommended to the Provost that Stern be appointed to replace Barnwell on an interim, part-time basis for the 1991–1992 academic year.

The Provost granted the Department emergency affirmative-action clearance for Stern's appointment; he notified Martin Meisel, the University's then-Vice President for Arts and Sciences, that Stern "should be informed that the appointment is interim and not considered renewable without a complete search in accordance with the University's Affirmative Action Program." (Letter from Provost Jonathan R. Cole to Meisel, dated May 2, 1991, at 1.) In June 1992, the Department received permission to reappoint Stern for a second year on the same basis.

On October 1, 1992, after it was decided that the Program should have a full-time director, Felix Martinez–Bonati, the Department's Chair, wrote to Meisel, requesting authorization to announce the position, conduct the normal search, and select the best candidate. The University, however, had identified the Spanish Department as one of three departments in the Humanities that were to be "targets for selective recruiting" of minority faculty. (Recruiting Tomorrow's Faculty: Minorities in the Arts and Sciences and the Graduate School at 2.) Further, it considered "direct intervention" by Meisel, in the form of communications to department chairpersons and participation in negotiations with prospective faculty, to be the "most effective way" of increasing the number of senior female faculty members. (Office of Equal Opportunity and Affirmative Action, Annual Review and Evaluation, dated September 1990, at 6.) Therefore, instead of granting the Department's request to advertise the director position and conduct a normal search, Meisel informed the Department that he planned to appoint Frances Boyd, a Senior Lecturer in the American Language Program who had consulted with the Department concerning its Language Program and had performed a study on the effectiveness of the Program, to the director position for a period of three years. Her qualifications for the position included an M.A. in Spanish language and literature, an Ed.D. in Adult Education Curriculum, and one year of teaching Spanish at the college level. In proposing to appoint Boyd, Meisel made no mention of the University's normal search procedures.

The Department strongly opposed the appointment of Boyd as director (though it valued the study she had conducted) and praised Stern's work as interim director of the Language Program:

The faculty and the graduate students of the Department ... think with rare unanimity that the job [Stern] has done as director of the language program since 1991 has been extraordinarily successful and indeed impossible to top. Our Department's language program is now a model for instructors of other Departments and Dr. Stern is being consulted by some of them to help them improve their language teaching.... We think that [Stern] can be said to be a true professional of language teaching, even if he did not obtain a Ph.D. in methodology or pedagogy but in literary studies....

Several of our graduate students are taking courses of language at various other Departments of the University .... [and have] told me that the courses that they are taking at those Departments are far inferior in materials and methodology to the ones they themselves teach. The language program in Spanish and Portuguese has never been done better....

(Letter from Martinez–Bonati to Meisel and Dean Roger Bagnall, dated October 25, 1992, at 3–4.) The Department recognized that existing procedures prevented the appointment of Stern on a full-time basis without a search, and it stated that "[t]he faculty thinks that, if Stern cannot be directly reappointed, a formal search has to be done to fill the position." (Letter from Martinez–Bonati to Meisel, dated October 25, 1992, at 1.)

Meisel retreated from his attempt to appoint Boyd summarily to the director position and agreed that, in conformity with the University's affirmative action policies, a search should be conducted. Normally, the search for candidates for a position in a single University department, such as the director position at issue here, would be conducted by a search committee comprising members of that department. In a departure from the University's past practices, however, Meisel appointed an interdepartmental search committee (the "search committee"). The interdepartmental committee was created in the belief that the Spanish Department would have appointed Stern if "left to its own devices." (Draft letter from Search Committee to Meisel, dated April 27, 1993, at 1.) The five-member committee Meisel appointed was headed by Department Professor Patricia Grieve and included only one other member from the Department. The other three members were in other language departments of the University (respectively, Russian, Italian, and East Asian Language); they did not speak, read, write, or understand Spanish.

After the completion of its initial screening process, the search committee determined that its first choice was Kenya Dworkin y Mendez, a Hispanic female, but she accepted a position elsewhere before an interview could be arranged. The committee subsequently interviewed three applicants: a white American woman, Puleo, and Stern. Stern's candidacy was supported by the Department's Chair, who wrote a letter of recommendation again praising Stern for his work as interim director of the Program:

Stern has directed the program with insuperable dedication, attention to every detail, and prompt response to all the usual emergenc[i]es generated by illness of instructors and the like. Moreover, he has given intense and sustained attention to the methodological improvement of the program, both in its overall conception and in its execution by each of the [teaching assistants] and Preceptors. He has inspired a strict sense of duty and discipline in our graduate students and has been uncompromising in observing these standards. It is a testimony to the quality of his work that the strict standards he demands of the graduate students (enforced with serious measures when needed) have resulted in his great popularity among them. The students respect and like him and emphatically approve of the way he conducts the program.

In the last one and a half years a growing consensus has emerged in the Department regarding Stern's work. As I expressed last semester to Vice President Martin Meisel in a letter, we think that the language program of the Department has never been better conducted than under Stern's direction, and that it is impossible to top his performance.

(Letter from Martinez–Bonati to Professor Patricia Grieve, Chair of Search Committee for Language Coordinator, dated January 23, 1993, at 1.)

In addition to interviewing the three final candidates, the search committee required each of them to teach a class ("model class"), observed by members of the committee. After observing the model classes, the search committee hired Puleo. The search committee reported that Puleo had demonstrated excellence in teaching and that Stern's teaching was weak. The offer to Puleo was extended approximately 1½ weeks after his interview; the University's ombuds officer, to whom Stern complained about the denial of his own application, viewed the search committee's final decision to make the offer to Puleo as having been made with "unusual rapidity."

Stern's complaint to the ombuds officer was referred to the University's Associate Provost, who in turn referred the complaint to Meisel. Meisel found no merit in Stern's suggestion that the decision had been made on the basis of national origin.

### D. The Present Action

Stern commenced the present action against the University alleging, *inter alia*, that in its overarching desire to appoint women and minorities to its faculty, the University had deviated from its affirmative action plan and had refused, because of his national origin, to give him fair consideration for the director position. The University moved for summary judgment, relying principally on affidavits from Grieve and Meisel and documentation concerning the affirmative action policies. The University stated that it hired Puleo based on legitimate, nondiscriminatory reasons—principally on Puleo's superior administrative and teaching skills—and it argued that Stern had presented no admissible evidence to show that these reasons were a pretext for discrimination.

In opposition to summary judgment, Stern submitted his own affidavit, various documents, and deposition testimony from a number of individuals involved in the search process, including the members of the search committee. He argued that a discriminatory basis for the University's decision could be inferred from the facts, *inter alia*, that his qualifications for the position were superior to those of Puleo; that the University deviated from its own prescribed practices in seeking to fill the director position; and that University officials had expressly indicated that Stern would not be considered seriously for the position. He pointed out that of the three candidates whom the search committee interviewed, Stern was the only candidate who had received a doctorate; that neither of the others had written as extensively as Stern or had as much college-level teaching experience; and that Stern had excelled in actually running the Program during his interim appointment, receiving glowing commendation for his performance in that capacity. He also pointed out that in seeking to fill the position, the University had more than once deviated from its normal procedures. The deviations included Meisel's early attempt to appoint Boyd as director without following the University's normal affirmative action procedures—permitting a factfinder to disbelieve the University's claim that in selecting Puleo it had merely adhered to those procedures; the unprecedented appointment of an interdepartmental search committee for a single-department position; and the disregard of the affirmative action plan's recognition that responsibility for applying judgmental criteria must rest primarily with the faculty of the department involved. In this case, Stern pointed out, though the Department had emphasized the need to hire a director who could teach courses in Portuguese, the search committee entirely ignored that need; of the three candidates interviewed, only Stern had proficiency in Portuguese.

Stern characterized as a "sham" the search committee's evaluation of his teaching skills solely on the basis of his model class. On that morning, a severe snowstorm cut student attendance by more than half and substantially delayed the arrival of those who did attend, forcing Stern to cover 50 minutes' worth of material in 30–35 minutes. He further argued that the search committee itself could not have been formed with a view

to finding the best qualified candidate, for the University had placed on the committee a majority of members who did not speak, write, read, or understand Spanish. Though the committee purported to have relied heavily on the candidates' respective skills in conducting the model classes, all three classes were taught entirely in Spanish and consisted of lessons on Spanish vocabulary and language structure. The three non-Spanish-speaking members of the committee acknowledged in their depositions that they could not determine in the model classes whether the candidates gave correct instructions or whether the students gave correct answers.

In his affidavit, Stern stated that search committee member Professor Maria Carrion had told him the Department needed more Hispanic members. In addition, Stern submitted the typewritten minutes of a meeting between Department teaching assistants and Meisel on October 29, 1992, recording Meisel as indicating, even before he had appointed a search committee, that it was "highly unlikely that Stern [would] return as language director." Finally, Stern submitted the deposition testimony of James Crapotta, a then-Senior Lecturer in Spanish at Barnard, who, in considering whether to apply for the director position had called Grieve as Chair of the search committee in an effort to determine whether he would be trenching on the toes of Stern, whom he regarded as a colleague. Crapotta testified that Grieve told him that Stern was "not going to be considered seriously for this job."

In an Opinion and Order dated November 3, 1995, reported at 903 F.Supp. 601, the district court granted summary judgment dismissing the complaint. The court found initially that Stern "can establish his prima facie case." 903 F.Supp. at 604. It found that Stern "belongs to a protected class"; that the satisfactory nature of his performance as acting director of the Program was not disputed; that he was denied the position of permanent director; and that "if viewed in the light most favorable to the plaintiff, it is not impossible that one could infer from the circumstances that the plaintiff was discriminated against." *Id.*

The court granted summary judgment in favor of the University, however, because it found that the University had come forward with "documentary evidence to rebut plaintiff's claims of unequal treatment and argue[d] that it has the right as an employer to hire the candidate it feels is best qualified for the position," *id.*, and that a court should not second-guess such business decisions. The court ruled that though Stern argued that the University's proffer should be viewed as pretextual in light of, *inter alia*, his qualifications, the University's affirmative action policy, and the irregularities in the procedures followed, none of Stern's arguments established that the University's proffer was pretextual. For example, the court stated that the fact that the University had attempted to appoint a woman without following its normal search procedures "would seem[ to] cut[ ] against" an inference of pretext because the Department had fended off the University's attempt. *Id.* at 605. The court rejected Stern's contention that the search committee's evaluation of his model class was a sham, stating that "the[ ] irregularities were probably the result of a snowstorm on the day of plaintiff's interview," and "hardly established the pretextual motives of the decision." *Id.* The court rejected Stern's contention that the appointment of a search committee whose majority did not have competence in Spanish, to judge the skills of candidates teaching Spanish, was a significant deviation from the University's normal procedures from which pretext could be inferred. The court found this departure insignificant, stating that "[t]he committee consisted of the same five members for all three candidates, and as stated above, the court will not second guess an entity's business decisions." *Id.*

Judgment was entered dismissing the complaint, and this appeal followed. For the reasons that follow, we vacate the judgment.

## II. DISCUSSION

In order to establish a prima facie case of discrimination in violation of Title VII, a plaintiff who asserts that he has been denied a position must show (1) that he belongs to a protected class, (2) that he was qualified for

the position, (3) that he was denied the position, and (4) that the denial occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. *See generally Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253 & n. 6, 101 S.Ct. 1089, 1094 & n. 6, 67 L.Ed.2d 207 (1981) (*"Burdine"*); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d at 37; *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991). Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of producing, " 'through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (*"Hicks"*) (quoting *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094) (emphasis in *Hicks* )).

In order to defeat summary judgment after such a showing by the defendant, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination. *See, e.g., Fisher v. Vassar College,* 114 F.3d 1332, 1339 (2d Cir.) (en banc), *petition for cert. filed,* 66 U.S.L.W. 3178 (U.S. Sept. 2, 1997) (No. 97–404); *Cronin v. Aetna Life Insurance Co.,* 46 F.3d 196, 204 (2d Cir.1995); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 38 (2d Cir.1994). If the plaintiff's evidence was barely sufficient to make out a prima facie case, it may not be sufficient to establish discrimination after the defendant has proffered a neutral rationale. *See Fisher v. Vassar College,* 114 F.3d at 1337, 1342, 1346.

When a court comes to consider, either upon defendant's motion for summary judgment, or after a plaintiff's verdict, whether the evidence can support a verdict of discrimination, .... the judge must analyze the evidence, along with the inferences that may be reasonably drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination. If so, summary judgment

must be denied and/or a jury verdict for plaintiff must be sustained. If not, the defendant is entitled to summary judgment or to the overturning of a plaintiff's verdict as clearly erroneous.

*Id.* at 1347.

It is of course well established that a motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See* Fed. R.Civ.P. 56(c). In assessing the record to determine whether there is such an issue, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

In the present case, the district court properly found, and the University does not contest, that Stern had presented sufficient evidence to make out a prima facie case of discrimination on the basis of national origin. Since the University satisfied its burden of producing admissible evidence of a nondiscriminatory reason for its action, the proper question on the motion for summary judgment was whether Stern presented evidence from which a jury could permissibly infer that, in denying Stern the directorship, the University had discriminated on the basis of national origin. That question should have been answered in the affirmative. The record included evidence from which the jury could infer (1) that Stern had superior qualifications, experience, and recommendations, and that notwithstanding the affirmative action plan's provision that after promising women and minority candidates are located all candidates are to be judged by the same standards, the key University officials, Vice President Meisel and Chairperson Grieve, did not apply the same standards here, expressly stating that Stern's candidacy would not be considered seriously; (2) that the reason was that the University desired to

hire a woman or Hispanic; (3) that that desire was inferable from, *inter alia,* (a) the University's initial attempt to give the position summarily to a woman without following any of its usual procedures, (b) the fact that, other than Stern, the only candidates seriously considered or interviewed for the position were either female or Hispanic, or both, and (c) the fact that the University's ultimate offer to Puleo, a Hispanic, was made with what the University's ombuds officer characterized as "unusual rapidity"; (4) that the University's claim that it simply appointed the best candidate it could find could be viewed as pretextual in light of its selection of that candidate through its unprecedented appointment of an interdepartmental search committee a majority of whose members, because of their inability to speak, read, write, or understand Spanish, were not competent to assess crucial skills of candidates for the director position; (5) that this atypical committee was created because of the belief that Stern would likely win the position if normal procedures were followed; and (6) that the committee claimed to have made its selection based principally on the relative teaching skills of Stern and Puleo as exhibited in classes conducted entirely in Spanish, which a majority of the committee concededly could not understand.

This evidence, along with the inferences that may be reasonably drawn from it, can hardly be deemed a weak or *de minimis* showing. It would be ample to support findings (a) that the University's rationale that it simply hired the best qualified candidate was pretextual, and (b) that the reason for the University's refusal to give serious consideration to Stern's candidacy was that he was not of Hispanic origin. We note that the various statements of University officials and search committee members relied on by Stern are not hearsay. For example, Stern's assertion that one search committee member told him that the Department needed more Hispanic members is not hearsay because that statement would not be offered for its truth, *see* Fed.R.Evid. 801(c), but rather as a statement from which, regardless of its truth, the University's emphasis on national origin in filling the position could be inferred. Further, though the early statements of Meisel and Grieve revealing that Stern's candidacy would not be considered seriously would be offered for their truth, they are not hearsay because they were statements by the University's agents as to matters within the scope of their duties. *See* Fed.R.Evid. 801(d)(2)(D). Given the strength of Stern's evidence permitting an inference of discrimination on the basis of national origin, the claim that the University discriminated against Stern in violation of Title VII could not properly be dismissed as a matter of law.

██ We disagree with much of the dissenting opinion for three principal reasons. First, in arguing that a court is "required to focus" solely on "the reasons given by the defendant for not hiring Stern," dissenting opinion *post* at 316, the dissent credits the University's explanation of the reason for its employment decision as a matter of law. While we do not second-guess an employer's hiring standards, the reasons for its employment decision, including its alleged reliance on such standards, are subject to scrutiny under Title VII, and "[d]epartures from procedural regularity," for example, "can raise a question as to the good faith of the process where the departure may reasonably affect the decision." *Zahorik v. Cornell University,* 729 F.2d 85, 93 (2d Cir.1984). Where the plaintiff has presented evidence sufficient to support an inference of impermissible discrimination and an inference that the reasons given by the defendant for its employment decision were not its real reasons, triable issues of fact are presented.

Second, the dissent draws all factual inferences adversely to Stern. Though a factfinder after trial surely would be permitted to draw the inferences argued for in the dissent, it would not be required to do so. What the dissent characterizes in the majority opinion as "speculation and conjecture," dissenting opinion *post* at 315, is merely our compliance with summary judgment jurisprudence, which requires this Court to construe the record in the light most favorable to the party against whom summary judgment was granted. A factfinder of course would not be required to draw inferences favorable to the plaintiff; however, where, as here, the factfinder would be permitted to do

so, this Court in reviewing summary judgment must do so.

Finally, the dissent considers the record solely in piecemeal fashion, proffering innocent explanations for individual strands of evidence. The jury, however, will be entitled to view the evidence as a whole in assessing whether there was impermissible discrimination and whether the University's proffered explanation is a pretext for that discrimination. *Cf., e.g., Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976) ("an invidious discriminatory purpose may often be inferred from the totality of the relevant facts"). For example, the dissent concedes that the search committee Chair's statement to Crapotta "that Stern was 'not going to be seriously considered for this job,'" is "evidence in the case suggesting that Columbia's explanation—that it hired Puleo over Stern because Puleo gave a better teaching performance—might be pretextual." Dissenting opinion *post* at 319. Though the dissent characterizes the Chair's statement as the "only" evidence from which pretext could be inferred, *id.,* the jury will plainly be entitled to assess that statement in the context of the record as a whole—including the circumstances that Puleo's teaching performance was evaluated by a committee whose majority, appointed by the University in a deviation from its usual procedure, did not know the language in which he taught—and to conclude that the relative teaching performances of Stern and Puleo were not a genuine reason for the University's decision and that the decision was based in whole or in part on a preference for hiring a person of Hispanic origin.

In sum, where, as here, the proffered rationale was that an evaluation had been made that one candidate was better than another, and the challenged decision was made only after the University had deviated from its normal decisionmaking procedures, had stated that it needed more Hispanics in the department in question, had appointed advisors who lacked proficiency in the skills they were asked to evaluate, and had informed another potential candidate that Stern's candidacy would not be considered seriously, we conclude that there were genuine issues of fact to be tried as to whether the University's explanation that it hired Puleo only because he was better than Stern was true, and whether the University refused to give serious consideration to Stern's candidacy because he was not of Hispanic origin.

## CONCLUSION

We have considered all of the University's arguments on this appeal in support of summary judgment and have found them to be without merit. The judgment is vacated, and the matter is remanded for trial.

CALABRESI, Circuit Judge, dissenting:

I do not disagree with the majority that Stern has made out a prima facie case of discrimination in violation of Title VII. It is clear that he has done so. But unlike the majority, I believe that his prima facie case is precisely the kind of minimal one discussed in this court's in banc decision in *Fisher v. Vassar College,* 114 F.3d 1332, 1336–37 (2d Cir.1997) (in banc). It is likewise indisputable that the university responded to Stern's prima facie case by proffering evidence of a non-discriminatory reason for its hiring decision. The majority believes that Stern presented evidence to allow a reasonable jury to infer that the explanation given by the defendant was pretextual and that discrimination was the real ground for defendant's actions. I disagree. Based on the facts presented, and the legally permissible inferences that may be drawn from those facts, I think that no factfinder could reasonably conclude that the defendant's explanation was false and, as required by *Fisher,* that bias was the true basis for the university's decision. Because this is so, the defendant was entitled to judgment as a matter of law. I therefore respectfully dissent.[1]

This case comes before us on motion for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

1. I do not dissent from the portion of the majori- ty opinion relating to the unsealing of the record.

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). We must construe the record in the light most favorable to the non-movant, in this case the plaintiff, drawing all permissible inferences in his favor. *See, e.g., id.* at 255, 106 S.Ct. at 2513; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). The inferences drawn must be supported by the evidence, however, and "mere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (internal quotation marks and citations omitted). Moreover, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2511; *accord Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 382 (2d Cir.1996).

I believe that there are two overarching flaws in the majority opinion. First, in evaluating the relative qualifications of the candidates, the majority has improperly substituted its own standards for the standards of the employer, which is incorrect as a matter of law. This is both wrong and deeply dangerous, as a majority of the court in *Fisher v. Vassar College* clearly affirmed when it joined a statement to that effect in my separate opinion in that case. *See Fisher,* 114 F.3d at 1361 n. 13 (Calabresi, *J.,* concurring in part and dissenting in part). Second, in

reviewing the evidence, the majority engages in speculation and conjecture that is unsupported by the record and that is inappropriate even in the context of a summary judgment motion. To illustrate these two flaws, I will point out seven problems that I have with the majority's treatment of the evidence in this case. There are more. The ones I will discuss relate to: (1) the plaintiff's allegedly superior credentials; (2) the fact that some members of the search committee did not know Spanish; (3) the attempt to hire Frances Boyd; (4) the allegedly irregular search procedure through which Augustus Puleo was hired; (5) the alacrity with which Puleo was hired; (6) Stern's testimony that a member of the Department had told him that the Department was looking for more Hispanic members; (7) the testimony of James Crapotta that the department was not taking Stern seriously as a candidate.[2]

1.

The majority remarks on "Stern's superior qualifications, experience, and recommendation." *Ante* at 312. This is a blatant example of the tendency of courts improperly to substitute their own standards for those of the employer. *See Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986) ("This court does not sit as a super-personnel department that reexamines an entity's business decisions."). The majority relies on the facts that Stern (1) was proficient in Portuguese as well as Spanish; (2) was familiar with the language program; (3) had more publications than Puleo; (4) had received a Ph.D.; and (5) had 25 years of teaching experience. But the first three credentials do not speak at all to the qualifications Columbia set out in its M.L.A. job announcement.[3] The fourth, at most, gives a pepper-

---

**2.** To the extent that I go beyond the district court's analysis in responding to points made by the majority, I rely on the authority of this court to affirm a grant of summary judgment on any ground supported by the record. *See, e.g., McNally Wellman Co. v. New York State Elec. & Gas Corp.,* 63 F.3d 1188, 1194 (2d Cir.1995).

**3.** The job announcement did not mention proficiency in Portuguese, familiarity with Columbia's language program, or academic publications as relevant criteria for selection. It is unsurprising

that academic publications were not required. Scholarly performance is, in fact, rarely looked for in language teachers, as the majority could have readily ascertained had it not been misled, by Stern's own emphasis on his publications and their importance, into assuming the opposite. But what matters is not even whether other universities look to such credentials (a fact that Stern did not, of course, place in the record). What matters is that Columbia *did not,* and had a perfect right not to do so.

corn of preference to Stern.[4] And the fifth, while it relates to a criterion—teaching ability—that Columbia deemed crucial, in no way identifies Stern as the better teacher (as anyone who has had a brilliant "new" teacher and a dreadful "highly experienced" one knows).

Significantly, none of the five factors the majority emphasizes reflect the reasons given by the defendant for not hiring Stern. Columbia stated that it hired Puleo over Stern because Puleo was a better teacher and administrator. In comparing the qualifications of the candidates, the court is required to focus on these two criteria. It may not substitute its own. *See, e.g., Scaria v. Rubin,* 117 F.3d 652, 654–55 (2d Cir.1997) (per curiam).

When Columbia's criteria are isolated, it becomes clear that there is no genuine issue of material fact casting doubt on the school's legitimate decision that Puleo was more qualified than Stern. It is true that, as the majority opinion notes, Stern received very good teaching evaluations during his tenure as an interim Director. Puleo, however, also had excellent teaching evaluations from running a larger language program at the University of Pennsylvania. Moreover, the parties do not dispute that while the class that Stern taught gave him a lukewarm reception after his model teaching, the class that Puleo instructed broke into spontaneous applause. Once again, it may be that the committee gave more weight to the model classes than the majority or I might deem wise. But they had a right to do so, because to do so did not constitute discrimination. And the fact that they chose to emphasize this aspect of teaching—rather than the aspects that Stern or the majority, had they been members of the search committee, might have judged to be more important—in no way raises an issue of material fact.

Stern also has not raised a genuine issue of material fact with respect to the search committee's assessment that Puleo was a better administrator. The parties do not dispute

that while Stern was evaluated as having strong organizational skills, he was also accused of creating "bureaucratic monsters." They also do not dispute that Puleo had significant administrative experience running the language program at the University of Pennsylvania and that the reports about him as an administrator there were glowing and free from any criticisms or questions.

It is simply inappropriate for a court to act "as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune,* 797 F.2d at 464; *cf. Fisher v. Vassar College,* 114 F.3d at 1361 n. 13 (Calabresi, *J.,* concurring in part and dissenting in part) (footnote joined by a majority of the in banc court). The Second Circuit very recently reaffirmed this position when it addressed a similar dispute over qualifications in *Scaria,* 117 F.3d at 654–55. In that case, the plaintiff claimed that he was more qualified than the person chosen for a supervisory position at the IRS because he had more years of schooling than the successful candidate. On the other hand, the successful candidate had a superior knowledge of IRS internal procedures, having worked for the IRS for a longer period of time. The court stated that "[a]s between experience and education, the IRS elected to value the first over the second in filling the job, and there is nothing to show that this value judgment was pretextual." *Id.* Likewise, there is nothing to show that Columbia's decision to value teaching and administrative skills over other qualifications was pretextual. *Cf. Fischbach v. District of Columbia Dep't of Corrections,* 86 F.3d 1180, 1183 (D.C.Cir.1996) ("Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates.").

### 2.

Second, the majority notes the fact that three of the five members of the search committee did not speak Spanish. It suggests that this might cast doubt on Colum-

---

**4.** While the job announcement said that a "Ph.D. was preferred," it expressly stated that candidates who had completed all their Ph.D. work except a dissertation would also be considered.

It is undisputed that Puleo was in the latter category, and expected to receive (and did receive) his Ph.D. within a year of the search.

bia's assertion that teaching ability was a key factor. It might, therefore, be evidence of pretext and hence of discrimination.

Here again the court substitutes its own standards for those of the university. It is not for the court to conclude that lack of knowledge of Spanish would preclude these three members (who were all language teachers from other departments) from evaluating a Spanish teacher's skills in running a class. And, as the district court pointed out, this ostensible deficiency applied equally to all three finalists in the job search.

More important, it is difficult to see how the lack of Spanish expertise could constitute any proof of discrimination. Indeed, one might have guessed the opposite, that inclusion of non-Spanish speaking language teachers could serve as a counterweight to those who might have valued "native" language ability more than generalized teaching skills. If anything, in other words, it might have run against the very "pro-Hispanic" bias that Stern conclusorily claims. The point, once more, however, is not whether it did this or not. It is only that Columbia had a right to use the committee it did.

### 3.

Third, the majority emphasizes Vice President Meisel's effort to appoint Frances Boyd, whom the plaintiff alleges was less qualified, without following the University's normal affirmative action procedures. The majority states that this would permit "a factfinder to disbelieve the University's claim that in selecting Puleo it had merely adhered to those procedures." *Ante* at 310. I do not disagree that if Boyd had been appointed, Stern might well have had a jury case. But Meisel's attempt to appoint Boyd was quickly quashed. And even if the attempt to hire Boyd could have suggested discrimination in favor of *women*, it in no way supports the discrimination that Stern claims occurred. The fact that a jury question might arise as to one kind of discrimination in no way means that it existed as to another, totally different sort. *Cf. Fisher*, 114 F.3d at 1349–50 (Jacobs, *J.* concurring).

### 4.

Fourth, the majority makes much of the "irregular procedure" through which Puleo was hired, which it characterizes as including the "unprecedented appointment of an interdepartmental search committee for a single-department position." *Ante* at 310. While there is little if any proof in the record, other than Stern's own self-serving testimony, that such a procedure was "unprecedented," at summary judgment I am inclined to assume that the procedure was in fact not the usual one.

Still, and quite aside from the plaintiff's conclusory and hyperbolic allegations, two uncontested facts about the procedure used emerge. One, the department had stated before any search had occurred that it wanted to hire Stern, an insider who had the accouterments of scholarship that were not—under the job announcement—qualifications for the position at stake. Two, such a prejudged decision would have violated university rules. Under the circumstances, why is the appointment of an interdepartmental search committee in any way suspicious? Indeed, given the department's undisputed prior actions, the appointment of just such an interdepartmental committee might have been essential to avoid charges of discrimination had Stern been selected.

I believe that on this issue the majority misses one of the key points of *Fisher v. Vassar* that applies by close analogy. *Fisher* held that *even a pretextual answer* (that is a lie) may not be enough to make out a jury case. It depends, the majority said, on the strength of the prima facie case and—crucially—the nature of the pretext. *See Fisher*, 114 F.3d at 1346–47. The same must, *a fortiori*, be true for deviations from ordinary selection procedures.

I do not doubt that there are situations in which the employment of an unusual search procedure points toward discrimination strongly and can create a jury question. *See, e.g., Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir.1984) ("Departures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may reasonably affect the decision.")

But there are also cases in which the use of such a procedure either points only very weakly towards discrimination or does not do so at all. *Cf. Fisher*, 114 F.3d at 1337–38. Even assuming then, as we probably must at summary judgment, that the procedure Columbia adopted was unusual, this is just such a case.

Both the administration and the department indisputably had proposed to fill the position in ways that would have given rise to a significant inference of some type of discrimination. The administration had done so when it proposed a direct provostial appointment of Boyd. The Department did it when it recommended the immediate appointment of Stern without following the required antidiscrimination search procedures. Under the circumstances, both traditional appointment methods (department and provostial) were suspect. What evidence of discrimination can then derive from the following of the usual form of appointment, but with non-department members added to the search committee? And the addition of non-department members, let us remember, is uncontestably the only allegedly "novel" aspect of this search.

We have long held that a "third motive," or non-discriminatory reason other than the one given by an employer, for not hiring the plaintiff takes the sting out of a pretextual answer. *See infra*, part 7. Similarly, the existence of an indisputably *good* and nondiscriminatory external reason must surely remove any significance that might otherwise attach to the employment of an unusual search procedure. It must do so, at least, when the procedure employed is, on its face, in no way discriminatory.

Assuming, therefore, that Columbia deviated from its customary search practices, Stern has still showed no evidence that the alleged deviation in this case in any way pointed to bias. The appointment of such a committee in itself showed nothing about discrimination. Nor would the mere existence of the committee provide support for a jury to conclude that Columbia's explanations were pretextual and that discrimination was the true basis for the hiring decision, because neither the makeup of the committee nor its procedures

gives rise to a scintilla of evidence of pro-Hispanic bias, the bias which Stern alleges cost him the job.

### 5.

Fifth, the majority refers to the alacrity with which Puleo was hired. Again, the speed with which a person is hired does not say a solitary thing on the issue of discrimination. Moreover, since Puleo had, indisputably, just run a first-rate model class during his visit, it seems entirely natural for Columbia to move quickly to hire him. This is particularly true given that Columbia, again indisputably, had just lost one of its original three finalists, who had withdrawn from the competition for the job to go to another school. If the dispatch with which an employer seizes a top candidate is evidence of discrimination, then woe betide those members of the federal judiciary who make offers to clerkship applicants only moments after a successful interview. Columbia could move quickly or slowly, as it chose. Why the majority insists on seeing evidence of discrimination in such a manifestly neutral act is simply beyond me.

### 6.

Sixth, the court gives weight to Stern's statement, made in an affidavit, that one search committee member had told him that the Department needed more Hispanic members. The statement in itself does no more than reiterate the goal of Columbia's affirmative action plan. I do not doubt that the alleged statement, like the existence of a plan, can be the basis of a prima facie case— the presence of which the district court assumed. The statement, however, does not add any evidence to what the existence of an affirmative action plan already introduced. One can repeat the goals of the plan twelve or twelve hundred times. Twelve or twelve hundred faculty members can assert their belief in those goals. But none of that does more than reaffirm what the plan by itself established. A minimal prima facie case *was* made out. Under *Fisher*, that is not enough to preclude summary judgment. *See Fisher*, 114 F.3d at 1346–47.

### 7.

Seventh, the majority relies on the deposition testimony of James Crapotta as supporting a finding of discrimination. Crapotta, a Lecturer in Spanish at Barnard, called Grieve in her capacity as chair of the search committee to determine whether he would be competing with Stern if he applied for the director position. (He wanted to avoid this because he viewed it as not collegial.) Grieve allegedly told him that Stern was "not going to be seriously considered for this job," which Crapotta took as encouragement to apply. This piece of evidence *is* significant because it is the *only* evidence in the case suggesting that Columbia's explanation—that it hired Puleo over Stern because Puleo gave a better teaching performance—might be pretextual.

The majority's construction of this comment as evidence of discrimination is nonetheless troubling, and ultimately self-defeating. Crapotta explicitly testified that Grieve did not state *why* Stern was not going to be considered for the job. More important, insofar as the comment had to be taken—given its undisputed context—as encouraging Crapotta, *a white male*, to apply for the job, it is at most evidence that the committee was motivated by a dislike of Stern rather than by discriminatory animus against white males. In other words, if it supports the notion that Columbia's explanation could be pretextual, it at the same time indicates a reason other than the one proffered that is clearly not discriminatory.

This court has repeatedly stated that such an alternative "third motive" non-discriminatory reason is sufficient to "explain away the proffer of a pretextual reason for an unfavorable employment decision." *Binder v. Long Island Lighting Co.*, 57 F.3d 193, 200 (2d Cir.1995). Thus, the possibility that such a reason might exist cannot preclude summary judgment. *See Fisher*, 114 F.3d at 1338 ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination [from the showing that the originally proffered explanation is pretextual] will be weak or nonexistent.").

In *Fisher*, we held that, despite the fact that the employer's explanation was pretex-tual and despite the fact that the pretext *did not* point to a non-discriminatory third motive, a minimal prima facie case, plus a finding of pretext, was not enough to bar a summary judgment. *See Fisher*, 114 F.3d at 1344–47. In this case, following a minimal prima facie case, and a facially non-discriminatory explanation, the plaintiff introduces only one piece of evidence that suggests the possibility that the defendant's explanation is pretextual. But that piece of evidence points—if it points anywhere—unquestionably to a non-discriminatory "third motive." With all respect, I cannot understand how, under *Fisher*, this suffices to make out a jury case.

\*　　\*　　\*

The seven "factual" issues I discuss above are examples. They are not meant to be exhaustive. They are characteristic, though, of what is wrong with the majority opinion in terms of the many legally improper inferences that the majority draws from the record. In the end, once Stern's self-serving and conclusory statements about his qualifications—which were not those Columbia deemed relevant for the position—are ignored, as they must be, very little remains. The whole of the evidence comes down to four things: a) Columbia had an affirmative action plan, in which it believed, that indicated that women and Hispanics were to be sought out (especially for the Spanish language department) but were not to be preferred in ultimate hiring; b) Columbia tried—perhaps improperly—to impose a non-Hispanic woman in the position and failed immediately; c) Columbia—for manifestly and uncontestedly good and non-discriminatory reasons—altered the normal search procedures by adding non-departmental language teachers to the search committee; and d) in trying to convince a qualified white male to apply for the job, a member of the search committee suggested that the plaintiff was a loser. I believe that, under the guidelines set out in *Fisher*, no reasonable factfinder could, based on this record, find in favor of the plaintiff, and therefore that the district court's grant of summary judgment to the

defendant should be affirmed. Accordingly, I respectfully dissent.[5]

---

**5.** One further point deserves mention. This case is a reverse discrimination suit and is based on the claim that Columbia discriminated in favor of Hispanics. Many discrimination cases allege the opposite—that the employer hired a white male instead of a member of a traditionally discriminated against group. In the ordinary discrimination case, the fact that the plaintiff was a member of such a group and was qualified for a position filled by someone who was not in such a group is enough to make out a prima facie case. In a case like this one, the existence of an explicitly non-discriminatory affirmative action plan, together with the hiring of a member of a group covered by the plan, is enough to make out (the majority, the district court, and I apparently agree) a prima facie case of discrimination by a qualified person who is not in one of the affirmative action categories. The majority, on virtually no additional evidence, holds that the claim survives summary judgment. If the majority's holding is more than the aberration that I believe it to be, what is an employer to do? An expensive, frequently ugly, jury trial seems mandated whichever way the employer picks among qualified applicants, some but not all of whom are women, aged, or have minority status. Surely, that is not what Congress intended when it enacted Title VII.