**Donnie ROSE, Plaintiff,**

v.

**JAMES RIVER PAPER COMPANY, Defendant.**

**No. 3:96CV1255 (GLG).**

United States District Court, D. Connecticut.

May 4, 1998.

Thomas E. Mangines, Brian A. Mangines, Mangines & Mangines, Fairfield, CT, for Plaintiff.

Peter M. Wendzel, Stephen B. Harris, Wiggin & Dana, Hartford, CT, for Defendant.

### Opinion

GOETTEL, District Judge.

This age discrimination case arises out of the elimination of plaintiff's job during a reduction in force instituted by James River Paper Company in response to significant reported financial losses. Plaintiff asserts that his job was eliminated because of his age. Defendant maintains that plaintiff's job was selected for elimination because the tasks he was performing were not as important to James River as those of his co-workers, and plaintiff had a poor performance record.

Defendant has moved for summary judgment [**Doc. # 27**] on all five counts of plaintiff's amended complaint, those being discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.* (Count One), intentional infliction of emotional distress (Count Two), breach of an implied contract (Count Three), promissory estoppel (Count Four), and breach of the covenant of good faith and fair dealing (Count Five). For the reasons discussed below, we grant defendant's motion for summary judgment in part and deny it in part.

### Background

Plaintiff Donnie Rose began employment with American Can Company in 1963. At the time, he was thirty years old. In 1982, James River, a leading marketer and manufacturer of consumer products, food and consumer packaging, and communications papers, purchased American Can, and offered plaintiff a position with James River. Plaintiff signed a letter agreement whereby he accepted James River's offer of employment upon the terms set forth therein, including the fact that his employment could be terminated at any time by him or by James River.

Plaintiff moved through the ranks at American Can and then at James River, until in 1984, at the age of fifty-one, plaintiff became a manager of sales technology in the sales department at James River. As such, plaintiff was responsible for information services for the sales department, procurement of computer hardware and software, training sales personnel in the use of computer systems, and several projects. From 1984 until 1991, plaintiff received consistently positive performance reviews of at least seven on a scale of one to ten, and received regular promotions and pay increases.

As the liaison between the sales department and the information services department, plaintiff, over time, developed an adversarial relationship with the head of the information services department, which resulted in plaintiff's receiving reported performance deficiencies. Additionally, the two projects for which plaintiff was responsible did not progress as anticipated. While both parties agree that the projects were not successful, they dispute the reasons for this. Plaintiff testified that the Sales Reporting Project failed because of budgetary constraints and the reluctance of the sales force to use it. Defendant places the blame on plaintiff. The Electronic Data Interchange Project, an e-mail system that would allow customers to transmit orders directly to James River, also made very poor progress. Plaintiff again places the blame on budgetary constraints as well as the new system's incompatibility with James River's existing system. Defendant points to plaintiff's poor performance. Plaintiff also had some problems with training the employees who worked under him. Although neither side has provided copies of plaintiff's performance evaluations after 1990, it is undisputed that his performance ratings declined prior to his termination. At the time, plaintiff was 58 years of age. Plaintiff speculates that this was done purposefully, in order to lay the groundwork for his termination.

In 1991, ostensibly because of performance problems, plaintiff was demoted from a grade-level 51 manager to a grade-level 50 individual contributor, although this did not affect his salary. Plaintiff asserts that this

demotion was forced upon him in that he was told he could either accept the demotion or take early retirement. In this new position, plaintiff had difficulty with his supervisor, who repeatedly questioned him about his plans for retirement.

In 1992, he was demoted again, this time to the grade 46 position of sales technology analyst. The summary judgment papers do not indicate whether plaintiff suffered a reduction in compensation. As a sales technology analyst, plaintiff was responsible for "troubleshooting" the computer system for field personnel, handling the business inventory system, maintaining the e-mail system, procuring computer hardware, and conducting training and other minor duties. This was the position that he held until his termination.

In 1986, James River had issued a Strategy Statement, which discussed the company's overall philosophy and goals. Included in the section on employee relations was a statement that, in order to successfully sustain the company's system of values and to effectively implement its performance strategy, the employee work force must be enthusiastic, supportive and involved in the company's operations and activities. The paper then defined the "desired future state" of employee relations, which included the statement that termination would only be for clearly defined cause and, except where clearly inappropriate, only after all other remedial measures have been taken. This was reiterated in the 1988 and 1990 Strategy Statements. In 1992, the Strategy Statement contained the same language, but also included a disclaimer (although not labeled as such) to the effect that this statement was an expression of goals and aspirations and did not create a contract or contractual obligation on the part of James River.

According to James River's 1992 Annual Report, it had approximately 38,600 employees. In 1992, it reported a net loss of $427,340,000, which appears to include "nonrecurring items" of approximately $350,000,000. This was down from a net income of $78,291,000 the prior year.

In the summer of 1993, James River, in response to this reported loss, James River undertook a "headcount reduction." The extent of this reduction is not disclosed in the papers before the Court. The Court has been provided with the company's process guidelines, which stated that, if a reduction in force became necessary within a group, the first step was to determine which jobs would be eliminated or consolidated with other jobs. Individuals with documented performance problems were to be terminated first. If there were more than one incumbent in a position in which reductions were to be made, and if their performance ratings were relatively equal, the person with the greatest company service was to be retained. Additionally, employees were not to be "bumped" from jobs that were not being eliminated or consolidated. Outplacement services were to be made available and all potential terminations were to be reviewed by the Business Human Resources Vice President.

In a memorandum dated August 11, 1993, plaintiff's supervisor, with whom plaintiff unquestionably had a personality conflict, suggested plaintiff's job for elimination. She wrote:

> In support of the RiverPark [1] staff reduction requirement I have one position which could be considered without significantly impacting our strategic programs. The position I'm referring to is the Sales Technology Analyst, currently held by Don Rose.

The rationale for choosing this position is twofold:

1. First, the work completed by this position is, for the most part, non-strategic in nature. . . .

2. Secondly, Don Rose has a history of performance issues over recent years which have been routinely coached and counseled. Even though job reassignments and down-grading have occurred, Don would continue to be classified in the lower productivity percentile within my organization. . . .

On September 2, 1993, plaintiff was notified that his job was being eliminated. At the

---

1. "RiverPark" refers to the Norwalk, Connecticut office in which plaintiff was employed.

time, he was sixty years old and was earning an annual salary of $55,400. Of the forty RiverPark positions discontinued in 1993, twenty-six were held by employees age forty or older; fourteen were held by persons under age forty. In 1993, James River had a total of 464 RiverPark employees, of which over two-thirds were under forty years of age. Additionally, approximately ten of the RiverPark positions eliminated were held by the oldest person in their respective departments. Five of these individuals had been recently demoted.

Plaintiff alleges that, following his termination, his job duties were split between two younger workers. Several months after his termination, a new employee was hired into his department. James River maintains that plaintiff was not replaced by this new hire or by the other younger members of the department. Instead, the two employees who plaintiff alleges took over his job duties[2] were hired before the reduction in force began; the one new employee hired following plaintiff's termination replaced someone other than plaintiff. Plaintiff's department continued to have one less employee than prior to plaintiff's termination.

**2.** Defendant stated in answers to interrogatories that plaintiff's duties were absorbed by defendant's IT department in Richmond, Virginia. Those "few duties" that remained at the Norwalk, Connecticut facility were absorbed by three employees, ages 57, 37, and 29.

**3.** Defendant, relying on only a portion of a deposition answer given by plaintiff, argues in its reply brief that plaintiff has attempted to create an issue of fact by changing his prior testimony given under oath. Defendant states: "The most egregious example of Rose's self-serving changes in testimony is his repeated assertion in the Opposition that he was told that he could not post for open positions. ... This assertion is the linchpin of the Opposition." Contrary to defendant's assertion, plaintiff very clearly states that he was told that he would not be considered for any other position.

 A. Well, I can't tell you precisely word for word, but I did say that I would take any job anywhere in the company at any level including a transfer, moving my family, whatever was necessary.

 Q. And what was the response?

 A. "There is nothing available for you."

 Q. Were you told whether you could post or not post for positions?

Plaintiff states that he, like other older employees who were terminated, was told by James River that he was not eligible to post for any other position at James River.[3] Upon being advised that he was being terminated, plaintiff told his supervisor that he would take any job anywhere in the company at any level, including a transfer, moving his family, whatever was necessary in order to stay employed and maintain his benefits until he reached retirement age. The response he received was that there was nothing available for him and that they wanted him out the door by noon. Contrary to defendant's assertion that there was nothing available, an employee in plaintiff's department had already advised the supervisor that he would be retiring. Although this employee performed a different job than plaintiff, plaintiff testified that he had previously performed similar job functions.[4] In any event, it is undisputed that plaintiff was not even considered for this job.

On February 22, 1994, plaintiff filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities. After receiving a notice of right to sue, plaintiff commenced this lawsuit.

 A. I was told that there was nothing available for me, that they wanted me out the door by noon.

 Q. Did the issue of posting for other positions come up at all during the conversation when you were terminated?

 A. Not that I recall, no. I was a terminated employee. You can't post if you are not employed.

 Q. Can you post when you're on salary continuation?

 A. I don't think so.

Plaintiff's deposition at 287.

**4.** This employee was Richard Scalzo, who was in "shelf management," a different area within the department than plaintiff. Plaintiff had never worked on the same program as Scalzo. However, plaintiff testified that, while he was in sales for 15 years, he managed three districts in which shelf management was a major part of his job. He also initiated a shelf management program that was computerized at James River. At the same time he was involved in the sales call reporting program, James River put a shelf management program into effect, which was essentially the same mechanically as the shelf program that Richard Scalzo was working on.

### Discussion

A motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. The burden of demonstrating the absence of a genuine dispute as to a material fact rests with the party seeking summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In assessing the record to determine whether there are any genuine issues of material fact, the Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against who summary judgment is sought. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997).

### Count I—Violation of the ADEA

Under the ADEA, an employer may not discharge an employee because of his age if that employee is at least forty years of age. 29 U.S.C. §§ 623(a)(1), 631(a); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609–10, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (noting that Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes. Thus, the ADEA commands that employers are to evaluate older employees on their merits and not their age). Claims under the ADEA are analyzed in the same manner as claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq. See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir.1997).

Under the traditional burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[5] in order to establish a prima facie case of discriminatory discharge in violation of the ADEA, a plaintiff must show, through direct or circumstantial evidence: (1) that he was within the protected age group; (2) that he was qualified for the position; (3) that he was discharged; and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination. *Burger v. New York Institute of Technology*, 94 F.3d 830, 833 (2d Cir.1996). An ADEA plaintiff is not required to show that he was replaced by a younger employee. *Woroski v. Nashua Corp.*, 31 F.3d 105, 108 (2d Cir.1994). The burden that an employment discrimination plaintiff must meet to defeat a motion for summary judgment at the prima facie stage is *de minimis*. *McLee*, 109 F.3d at 134.

Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of articulating a legitimate, non-discriminatory reason for its actions. *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir.1997). The employer's burden is one of production, not persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer articulates an age-neutral reason, in order to defeat a summary judgment motion, the plaintiff must then present admissible evidence from which a rational factfinder could infer that the defendant's employment decision was false or unworthy of belief and that its decision, more likely than not, was based in whole or in part on age. *Stern*, 131 F.3d at 312; *Woroski*, 31

---

**5.** The plaintiff devotes over sixteen pages of his response to the argument that summary judgment should not be granted in defendant's favor under a *McDonnell Douglas* analysis. Plaintiff then argues for just over one page that this is not a pretext case after all; rather, it is a mixed-motive case to which the *Price Waterhouse* analytical framework should be applied. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under *Price Waterhouse*, if the plaintiff proves that a prohibited discriminatory factor played a motivating part in the challenged employment decision, the burden then shifts to the employer to prove by a preponderance of the evidence that it would have

made the same decision anyway. *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir.1997). However, plaintiff bears a heavier burden at the outset than under the *McDonnell Douglas* analysis. *Id.* Defendant maintains that the appropriate analysis is under *McDonnell Douglas*. Under either scheme, plaintiff must ultimately prove that age was a motivating factor in defendant's decision to terminate his position. Because we find genuine issues of material fact in this regard, it matters not which approach we take at this summary judgment stage, given the facts of the instant case. Under either approach, we find that summary judgment is not warranted on plaintiff's ADEA claim.

F.3d at 109; *Fisher v.. Vassar College*, 114 F.3d 1332, 1339 (2d Cir.1997) (en banc), *cert. denied*, — U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

In light of the ease with which a plaintiff can establish a prima facie case of discrimination and an employer can point to downsizing to justify any termination, ADEA suits in the context of a reduction in force often turn on whether the plaintiff has established that the rationale offered by the defendant was a mere pretext for age discrimination. *Viola v. Philips Medical Systems of North America*, 42 F.3d 712, 716 (2d Cir.1994). The court must analyze the evidence, along with all reasonable inferences, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination. *Fisher*, 114 F.3d at 1347.

■ We begin by examining whether plaintiff has carried his *de minimis* prima facie burden. Clearly, at the age of sixty, he was within the protected group, and he was discharged. James River has conceded these points. James River, however, contends that plaintiff has not met his prima facie burden because he cannot prove that he was qualified for the position or that his discharge occurred under circumstances giving rise to an inference of discrimination. We disagree.

Plaintiff alleges that he was capable of performing any job within the department and that he had trained most of the people in his department. Indeed, many of the job functions plaintiff was performing in 1993 were closely related to those jobs he supervised from 1984 to 1991. There is no evidence that plaintiff was discharged because he was not qualified. James River's own documents indicate that his position was eliminated, not that he was discharged for lack of qualifications. Although plaintiff

clearly had personality problems with his supervisor, even she stated that his position was chosen for elimination for two reasons, the non-strategic nature of the work he performed and his below average productivity.

Given plaintiff's thirty-year history of employment with the company and the fact that, for at least eight years, he held a job at a much higher grade level than his last position and that he trained many of the people with whom he worked, we find that plaintiff has carried his *de minimis* burden of proving that he was qualified for the position from which he was terminated.

■ The last·element of plaintiff's prima facie case is whether there is evidence giving rise to an inference of age discrimination. In making this determination, the Court must decide whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational factfinder to infer a discriminatory motive. *McLee*, 109 F.3d at 135. At the time of plaintiff's termination, he was the oldest member of his department. Of the eight other members, two were in their forties; five were in their thirties; and one was in his twenties. None had been employed as long as plaintiff. Plaintiff also presented evidence concerning significant performance problems with another, younger female employee within the department.[6] This raises a question as to why plaintiff was chosen for termination over her, if performance was the sole basis for James River's decision. Plaintiff also cites to the fact that several James River management employees made age-related comments to the effect that older managers would have to be replaced and he was repeatedly questioned by his supervisor about when he was going to retire.[7] There is also evidence that a dispro-

**6.** Plaintiff provided excerpts of the deposition of another member of their department who characterized this younger woman's performance as "very very poor." He also stated that she had a problem with tardiness and excessive absenteeism and had a poor attitude toward her work.

**7.** Defendant asserts that this evidence must be disregarded as inadmissible hearsay. However, similar evidence was considered by the Second Circuit in *Stern v. Trustees of Columbia University, supra*. The court stated:

We note that the various statements of University officials and search committee members relied on by Stern are not hearsay. For example, Stern's assertion that one search committee member told him that the Department needed more Hispanic members is not hearsay because that statement would not be offered for its truth, *see* Fed.R.Evid. 801(c), but rather as a statement from which, regardless of its truth, the University's emphasis on national origin could be inferred. Further, though the early statements of [the Vice President and

portionate number of the positions eliminated were held by employees over the age of forty.[8] Additionally, there is evidence that plaintiff was told that no other jobs within the company were available to him, despite his thirty years of experience and his willingness to take any job, anywhere.[9] Indeed, there was a job available in plaintiff's own department that was filled shortly after his termination with a new, younger employee.[10] Plaintiff has also provided affidavits of several former employees over age forty, who attest that a supervisor stated that James River was attempting to get rid of its older workers; that they received their first poor performance evaluation just prior to their terminations and that their duties were transferred to younger workers.[11] Plaintiff has also presented evidence that he was demoted and received poor performance appraisals prior to his being terminated, which he contends were part of an overall effort by defendant to get rid of its older workers.[12]

When the totality of plaintiff's evidence is considered for purposes of determining whether plaintiff has met his prima facie burden, we find sufficient evidence to allow a trier of fact to draw a reasonable inference of age discrimination. *See Burger,* 94 F.3d at 833–34. Thus, we deny defendant's motion for summary judgment as to plaintiff's failure to meet his prima facie burden on his ADEA claim.

█ Once the plaintiff meets his prima facie burden, the defendant must then proffer a legitimate, non-discriminatory reason for plaintiff's discharge. *Viola,* 42 F.3d at 717. In this case, James River proffered two such reasons: the reduction in force and plaintiff's performance of non-essential jobs. Once an employer has produced evidence of a non-discriminatory rationale for its actions, the factual inquiry proceeds to a new level of specificity. *Id.* (quoting *St. Mary's Honor*

Chairperson] revealing that Stern's candidacy would not be considered seriously would be offered for their truth, they are not hearsay because they were statements by the University's agents as to matters within the scope of their duties. *See* Fed.R.Evid. 801(d)(2)(D). *Stern,* 131 F.3d at 313.

8. Defendant argues that plaintiff cannot rely on statistical evidence because he has not retained a statistician to present expert testimony concerning the conclusions to be drawn from this data. No expert is required. *See Stratton v. Department for the Aging for the City of New York,* 132 F.3d 869, 877 (2d Cir.1997). A party is not required to retain a statistician to present the results of simple statistical information. Plaintiff is not advancing any sophisticated statistical theories that require explanation. Additionally, this is a disparate treatment case, and, thus, the statistical evidence may be less finely tuned than in a disparate impact case. *See Id.*

9. *See Chertkova v. Connecticut General Life Insur. Co.,* 92 F.3d 81, 91 (2d Cir.1996) (holding that, in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees or a pattern of recommending the plaintiff for positions for which he is not qualified and the failure to consider plaintiff's name for positions for which he is well-qualified may be circumstances that give rise to an inference of discriminatory motive). *See also Gallo v. Prudential Residential Services, L.P.,* 22 F.3d 1219 (2d Cir. 1994).

10. It may well be that plaintiff's supervisor told plaintiff that he could not apply for any other job within the company because of the personality conflicts between them. That is not age discrimination. However, these statements could also give rise to a reasonable inference of discrimination, since they indicate that the company was not willing to consider a former employee for any position whatsoever despite the fact that he had thirty years of experience and had served in a managerial capacity.

11. Plaintiff has also produced a confidential James River memo from one of its directors regarding future business goals, which states: "We know some of our older people will not meet the future structure." There are two problems with plaintiff's reliance on this memo. The first is a relevance problem since the memo is dated in 1985, eight years prior to plaintiff's termination. The second and more important reason is the lack of authenticity. Defendant has produced a sworn affidavit of the purported draftsman, who denies that he ever wrote this memo and claims that his signature was forged. Absent evidence as to the memo's authenticity, we have disregarded it in ruling on the motion for summary judgment.

12. Defendant argues that this evidence cannot be considered because plaintiff did not file charges of discrimination relating to his demotions. However, if plaintiff can prove that these demotions and lower performance evaluations were part of the termination process, this evidence would be relevant to plaintiff's claims. *See Cronin v. Aetna Life Insur. Co.,* 46 F.3d 196, 204 (2d Cir.1995).

*Ctr. v. Hicks,* 509 U.S. at 516, 113 S.Ct. 2742). To defeat a properly supported motion for summary judgment, plaintiff must produce sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false and that discrimination was the real reason. *Fisher,* 114 F.3d at 1339. Plaintiff need not show that age was the only reason he was terminated, only that age was a substantial factor in the decision. *Burger v. New York Institute of Technology,* 94 F.3d at 833; *Levin v. Analysis & Technology, Inc.,* 960 F.2d 314, 317 (2d Cir.1992).

At this summary judgment stage, we are not to resolve factual issues; we are only to determine whether there are issues of fact to be tried. *Cronin,* 46 F.3d 196, 203 (2d Cir. 1995). Moreover, we are required to view the record as a whole and to draw all permissible factual inferences in favor of the plaintiff. *Stern,* 131 F.3d at 313–14.

The plaintiff has presented sufficient evidence from which a jury could infer that age played a substantial role in James River's decision to eliminate plaintiff's position, as opposed to another position within his department, as part of its reduction in force. There is evidence that at least one other member of the department had significant performance problems, yet she was not selected for termination; that two other younger employees were hired shortly before plaintiff's termination and another younger employee was hired shortly thereafter; that the oldest members of other departments were terminated and also suffered poor performance appraisals immediately prior to their termination; that a disproportionate number of employees over forty were terminated; that many of plaintiff's job responsibilities were re-assigned to younger workers; and that despite plaintiff's thirty years with the company, it refused to consider him for any other open position. From this evidence a factfinder could reasonably infer that the reasons advanced by James River for plaintiff's termination were false and that plaintiff's age was a substantial factor in his job being terminated. At a minimum, there are genuine issues of material fact. Therefore, we deny defendant's motion for summary

judgment as to Count One, plaintiff's ADEA claim.

### Count II—Intentional Infliction of Emotional Distress

██ Under Connecticut law, to establish a cause of action for intentional infliction of emotional distress, a plaintiff must show that: (1) the defendant intended or knew that emotional distress would likely result from its conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused plaintiff distress; and (4) that plaintiff's distress was severe. *Vorvis v. Southern New England Telephone Co.,* 821 F.Supp. 851, 855 (D.Conn.1993), (citing *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986)).

In interpreting what constitutes "extreme and outrageous" conduct, Connecticut courts have relied on the Restatement (Second) of Torts § 46, comment (d) (1965), which provides: "Liability has been found only where the conduct has been, so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See DeLaurentis v. City of New Haven,* 220 Conn. 225, 267, 597 A.2d 807 (1991); *Petyan v. Ellis,* 200 Conn. at 254 n. 5, 510 A.2d 1337.

██ Whether a defendant's conduct rises to the level of being "extreme and outrageous" is a question to be determined by the Court in the first instance. *See, e.g., Johnson v. Chesebrough–Pond's USA Co.,* 918 F.Supp. 543, 552 (D.Conn.), *aff'd,* 104 F.3d 355 (2d Cir.1996). Here, plaintiff has not alleged that his termination was done in a manner that was so egregious or oppressive as to rise to the level of extreme and outrageous conduct. Therefore, we find that plaintiff has failed to allege conduct on the part of James River from which a reasonable jury would be permitted to infer that James River's conduct was sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress. *See Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1242 (2d Cir.1995); *Kintner v. Nidec–Torin Corp.,* 662 F.Supp. 112, 114 (D.Conn.1987).

### Count III—Breach of Implied Contract

 Relying on the statements in James River's Strategy Statement that "termination is only for clearly defined cause," plaintiff asserts a claim for breach of contract by virtue of his termination. Plaintiff's assertion that the Strategy Statement constituted a binding employment contract overlooks the clear language of this document. The stated purpose of the Strategy Statement was, *inter alia*, to "[e]stablish a common philosophy throughout James River Corporation based upon defined values and goals," and to "[p]rovide a guide for corporate management to aid in choosing where and how to allocate human and financial resources." The Strategy Statement reflected the goals and objectives of the company. It did not constitute a binding contract. Indeed, the very statement upon which plaintiff relies is found within a section entitled "interpretive papers," which states that these

> represent the Corporate Policy Committee's *vision of the future* where not already in place. While progress toward achieving the *desired future state* is expected, it is anticipated that progress will vary within and between staff groups and businesses. One measurement of performance will be the extent to which these goals are achieved over time. Within each of these papers, the concepts advanced and the elements of progress are interrelated and should proceed together. This is especially true in the area of employee relations.

The Employee Relations Interpretive Paper then defines and interprets the "*desired future state* of employee relations" in terms of job security and compensation (and perhaps other areas not included in the papers submitted to the Court), which includes the statement relied upon by plaintiff, *i.e.* that termination will only be for clearly defined cause.

 Under Connecticut law, contracts of employment are terminable at will. *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 15, 662 A.2d 89 (1995). Indeed, in this case, plaintiff's written contract with James River expressly provided that it was terminable at will. Although the rule of employment at will can be modified by an agreement of the parties, to prevail on this claim, a plaintiff must prove that the employer had agreed, either by words or action or conduct, to undertake some form of actual contractual commitment under which the employee could not be terminated without just cause. *Id.* Plaintiff attempts to modify his written contract based upon statements in the Strategy Statements. It is clear, however, that the Strategy Statements were expressions of corporate philosophies, goals and objectives, not contractual promises. These statements were not sufficiently promissory to support a breach of contract action. *See D'Ulisse–Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 214, 520 A.2d 217 (1987). Moreover, there is no evidence that James River intended this Strategy Statement as an offer modifying the preexisting terms of the written contract, or that the proposed modification was ever accepted by the employee. *See Torosyan*, 234 Conn. at 14, 662 A.2d 89. "Typically, an implied contract of employment does not limit the terminability of an employee's employment but merely includes terms specifying wages, working hours, job responsibilities and the like." *Id.*

In light of the express written contract between plaintiff and defendant, the lack of promissory language in the strategy statements and the clear expression of "desired future" objectives, and the lack of any evidence that this was intended as an offer modifying the prior contract or that plaintiff ever accepted this "offer," we hold that defendant is entitled, to summary judgment as a matter of law on plaintiff's breach of implied contract claim set forth in Count Three.

### Count IV—Promissory Estoppel

 Like Count Three of the complaint, plaintiff's claim for promissory estoppel set forth in Count Four is premised upon the alleged "promises" of job security set forth in the Strategy Statement. As the Connecticut Supreme Court held in *D'Ulisse–Cupo*, 202 Conn. at 214, 520 A.2d 217, "[w]e agree with the defendant[ ] that these representations do not invoke a cause of action for promissory estoppel because they are neither sufficiently promissory nor sufficiently definite to support contractual liability." As discussed above, these statements were no more than

future goals, strategies, and objectives of the employer. They do not manifest a present intent on the part of James River to undertake immediate contractual obligations to plaintiff. *See Id.* at 214–15, 520 A.2d 217. Therefore, we find that there are no genuine issues of material fact regarding plaintiff's claim of promissory estoppel, and hold that defendant is entitled to judgment as a matter of law on Count Four.

### Count V—Implied Covenant of Good Faith and Fair Dealing

Plaintiff's last count alleges that defendant breached an implied covenant of good faith and fair dealing existing between the parties by virtue of their employment agreement by prohibiting plaintiff the opportunity to grow with the company by discharging him because of his age in violation of law and company policies. Defendants assert that there is no evidence to support this claim.

Connecticut courts have recognized that "[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon,* 224 Conn. 231, 238, 618 A.2d 501 (1992). The implied covenant of good faith and fair dealing operates to "fulfill the reasonable expectations of the contracting parties as they presumably intended." *Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 567, 479 A.2d 781 (1984). Under Connecticut law, the implied covenant of good faith and fair dealing is not an independent requirement, but instead arises from and is dependent upon the existence of an enforceable contract. *Omega Engineering, Inc. v. Eastman Kodak Co.,* 908 F.Supp. 1084, 1091 (D.Conn.1995). It cannot be applied to achieve a result contrary to the clearly expressed terms of the contract. *Eis v. Meyer,* 213 Conn. 29, 36, 566 A.2d 422 (1989). Here, plaintiff's contract provided that it was terminable at will.

To establish a claim for breach of an implied covenant of good faith and fair dealing, where the employment is terminable at will, an employee must establish that his dismissal was for a demonstrably improper reason, the impropriety of which is derived from a violation of some important public policy. *Johnson v. Chesebrough–Pond's,* 918 F.Supp. at 550 n. 4. Plaintiff has alleged that his termination was because of his age, which, if true, would violate an important public policy embodied in the ADEA. It is not enough, however, to point to an important public policy. A plaintiff bringing a claim for violation of the implied covenant of good faith and fair dealing must also establish that he does not otherwise have an adequate means of vindicating that public policy. *Bennett v. Beiersdorf, Inc.,* 889 F.Supp. 46, 49 (D.Conn.1995). As this Court held in *Bennett,* the public policy against age discrimination in employment cannot justify a claim based upon a breach of the covenant of good faith and fair dealing because there are already sufficient statutory remedies. *Id.* Age discrimination is the sole basis for this count of plaintiff's complaint. To the extent that plaintiff can prove this claim, he has an adequate remedy under the ADEA. Therefore, we grant defendant's motion for summary judgment as to Count Five.

### Conclusion

Defendant's Motion for Summary Judgment [Doc. # 27] is GRANTED as to Counts Two through Five. Defendant's Motion is DENIED as to Count One.

SO ORDERED.