Daniel J. GOLDSCHMIDT, Plaintiff,

v.

NEW YORK STATE AFFORDABLE HOUSING CORPORATION et al., Defendants.

No. 03 Civ 6617(DC).

United States District Court, S.D. New York.

Aug. 8, 2005.

Gordon, Gordon & Schnapp, P.C., by Kenneth E. Gordon, Esq., New York, NY, for Plaintiff.

Hitsman, Hoffman & O'Reilly LLC, by John F. O'Reilly, Esq., Elmsford, NY, for Defendants.

## OPINION

CHIN, District Judge.

In this employment discrimination case, plaintiff Daniel Goldschmidt alleges that defendants New York State Affordable Housing Corporation ("AHC"), New York State Housing Finance Agency ("HFA"), Jerome Becker, Michael D.D. White, and Robert Drillings (collectively "defendants") discriminated against him on the basis of religion and retaliated against him, in violation of federal, state, and city law. Defendants move for summary judgment dismissing all claims. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

### A. The Facts

Construed in the light most favorable to plaintiff, the non-moving party, the facts are as follows:

### 1. The Parties

AHC is a public benefit corporation organized under the laws of the State of New York. AHC is a subsidiary corpora-

tion of HFA (together, "the agencies"), also a public benefit corporation organized under the laws of New York. (Def. 56.1 Statement ¶ 1).[1] AHC "was established to administer the Affordable Home Ownership Development Program," the purpose of which "is to promote home ownership by persons of low and moderate income," by providing financial assistance for the purchase, construction, and rehabilitation of owner-occupied housing. "About AHC," *available at* http://www.ahc.org/ahc/aboutAHC.html (last visited July 15, 2005). The two agencies share administrative and management functions and personnel. (Def. 56.1 Statement ¶ 2).

Becker is the chairman of the board of directors of the agencies. (*Id.* ¶ 6). Becker is Jewish. (*Id.* ¶ 7). At all times relevant to the instant action, Drillings served as Senior Vice President and Counsel to the agencies, and was head of the Legal Unit. (*Id.* ¶ 3). Drillings is Jewish. (*Id.* ¶ 3). At all times relevant to the instant action, White served as Vice President and Deputy Counsel to HFA and AHC. White was responsible for administrative and personnel matters in the Legal Unit. (*Id.* ¶ 4). White is not Jewish. (*Id.* ¶ 5).

Goldschmidt was employed as an Assistant Counsel in the Legal Unit of AHC from July 17, 2000 until May 10, 2002. (*Id.* ¶¶ 10, 117; Pl. Resp. to Def. 56.1 Statement ¶ 117). Goldschmidt is an Orthodox Jew. (Goldschmidt Aff. ¶ 3).

### 2. *Requests for Accommodations and Extensions of Probation*

Goldschmidt was interviewed for an Assistant Counsel position by Drillings and White on May 18, 2000. (Goldschmidt Aff. ¶ 4). Goldschmidt was offered the position in late June, 2000, and accepted it on July 7, 2000. (*Id.*). Goldschmidt then met with Drillings on July 11, 2000, at which time he informed Drillings that he was an observant Jew and would require religious accommodation. (*Id.*).

Early in his employment, Goldschmidt requested periodic accommodations, including three days off from September 27–29, 2000, to make his annual religious pilgrimage to the Ukraine. (*Id.* ¶ 7, 11; Def. 56.1 Statement Ex. G). In the fall of 2000, as sunset started arriving earlier in the day, Goldschmidt needed to adjust his schedule to allow him to leave earlier on Fridays.[2] (*Id.* ¶ 9). Goldschmidt submitted a "Flextime Request Form" dated October 6, 2000, requesting a schedule, beginning November 2, 2000, in which he would leave at 1:30 p.m. on Fridays, and work later on Mondays, Wednesdays, and Thursdays to make up the time. (*Id.* Ex. B). The request was approved by Goldschmidt's supervisor at the time, Barbara Roslyn. (*Id.*). On October 13, 2000, one week after Goldschmidt's flextime request, Goldschmidt's probationary period was extended for sixty days. (*Id.* Ex. C).

On October 27, 2000, Goldschmidt emailed White, discussing his flextime request and explaining why he had not submitted a formal flextime request for his increasingly earlier departures on Fridays in October. (Goldschmidt Aff. Ex. A). White emailed him back the following response:

Isn't this all a bit finugliated? I mean isn't it an awful lot for you to be asking the Deputy Counsel to read through to keep track of whether you are putting in a regular day? And then, given the

---

1. Where defendants' 56.1 Statement is cited, plaintiff has admitted the statement, unless otherwise noted.

2. Observant Jews must be home before sundown on Fridays to observe Shabbat, the Jewish Sabbath.

confusing complexity of it all would I truly be keeping track of everything that I needed to know to be sure that there were no holes in your equations if I didn't manage to look at all your other start and end times? That would then get me into your irregular arrival times which are themselves a problem as Barbara has mentioned to you.

(*Id.*).

During the period that followed, Goldschmidt "was repeatedly admonished by White that [his] Friday afternoon departures were an imposition on the [a]gencies." (*Id.* ¶ 12). On January 16, 2001, Goldschmidt's probation again was extended, for 180 days. (*Id.* Ex. D). On January 19, 2001, Drillings sent an email to various individuals at the agencies regarding the extension of Goldschmidt's probation and his work performance.[3] The subject of the email was "Daniel Goldschmidtuel." (O'Reilly Reply Decl. Ex. I).

In April 2001, Goldschmidt suggested a revision in his schedule, as he no longer needed to leave as early on Fridays, but did need to leave early on alternate Tuesdays to attend a regularly scheduled doctor's appointment. (Goldschmidt Aff. ¶ 13). According to Goldschmidt, White "was initially unwilling to change [plaintiff's] schedule, and ultimately dictated what he indicated . . . was the only revised schedule he would accept." (*Id.*). The revised schedule actually required plaintiff to work more than forty hours per week in alternating weeks. (*Id.* Ex. E).

During the spring of 2001, Goldschmidt took time off for Purim on March 9, Passover on April 9, and Shavous on May 29. He also requested from White and Drillings that he be allowed to work extra hours "to earn additional leave time to enable [him] to observe the Jewish holidays in the fall and make [his] annual pilgrimage to the Ukraine." (Goldschmidt Aff. ¶ 14). White and Drillings responded that "they would not consider this request and that the [a]gencies had no obligation to accommodate what Drillings characterized as [his] 'vacations.' " (*Id.*). Because of their response, Goldschmidt did not make his pilgrimage that year. (*Id.*).

Upon completion of his probationary period, Goldschmidt's probation was extended in August 2001 for another ninety days[4]; the probationary review sheet stated that the agencies were "monitoring Mr. Goldschmidt's time and attendance." (*Id.* Ex. F).

In the fall of 2001, Goldschmidt switched back to the fall schedule, leaving earlier on Fridays, a switch which, according to Goldschmidt, was done "in the face of complaint and derision by White." (*Id.*). In January 2002, Goldschmidt requested time off from March 25–April 5, 2002, to observe Passover, and told White and Drillings that he was willing to work holidays or other additional hours to accumulate enough leave to cover this period. Because Goldschmidt was never told he could work additional hours, he withdrew his original leave request, modifying his request to take off only four days. (*Id.* ¶ 23).

---

**3.** Plaintiff alleges that White originated the email, based on an email from White produced during discovery that contained the subject line "Re: Daniel Goldschmidtuel." It is clear from the record that White was responding to Drillings' email, and that it was Drillings who originated the "Goldschmidtuel" subject line. (Fischetti Decl. ¶ 11; O'Reilly Reply Decl. Ex. I, email log).

**4.** Although the probationary review is dated July 16, 2001, Goldschmidt states that the action was not taken until August 2001, and points in support to an email from Drillings to White dated July 30, 2001 that makes clear that a decision was still pending on that date. (Gordon Aff. Ex. C).

### 3. *Performance Appraisals and Termination*

In January 2002, Drillings and White gave Goldschmidt his first performance appraisal. Goldschmidt's average score for the twenty individual categories, on a scale ranging from 1 ("unsatisfactory") to 5 ("outstanding"), was a 3.075; nevertheless, Drillings and White gave plaintiff an "overall score" of 2, automatically requiring a re-evaluation in three months. (*Id.* Ex. G). None of the other five Assistant Counsels was given an overall rating lower than their average rating, nor was any given an overall rating of 2.[5] (Pl. 56.1 Statement ¶ B3; Gordon Aff. Exs. G–L). One other Assistant Counsel received an average rating of 3.075, identical to Goldschmidt's, but received an overall rating of 3.75. The comments on Goldschmidt's evaluation characterized his work as "generally . . . satisfactory," and suggests multiple areas in which improvement was needed, including the ability to handle multiple tasks at once and independently oversee a major transaction. (Goldschmidt Aff. Ex G). The comments also state that Goldschmidt fails to "have a natural internal sense or intuition of what is called for from him in various personal conduct matters so that it is necessary to request certain behavior from him, including specifically arriving in time in the morning for meetings on projects to which he is assigned." (*Id.*). The evaluation then states the following:

> We have tried to meet Mr. Goldschmidt more than half way [sic] on a number of things where he has special needs, the principal one being to have set up a fairly complicated set of working hours as the basis for his regular work week

which then received periodic adjustment. Having done so, we note that Mr. Goldschmidt has paid a lot of shrewd attention to examining what further accommodations he could be given but has not completely lived up to the deals struck with him on the accommodations that he has been given. He asks that we cut him slack based on extra hours he saying [sic] he is willing to work when everyone else has gone home, but, at the same time, he is squeezing so many personal chores and pursuits into the regular and extended workday that it makes any such special calculus very tricky.

(*Id.*).

On January 14, 2002, Goldschmidt met with White and Drillings to discuss the appraisal. White and Drillings told plaintiff that, at his option, he could be re-evaluated within six months; he was not told that he would be put on probation. (Goldschmidt Aff. ¶ 20). Drillings was optimistic after discussing Goldschmidt's appraisal with him that "things were going to work out with Mr. Goldschmidt at the agency." (Drillings Dep. at 199).

At the end of the meeting, Goldschmidt handed White and Drillings his informal letter response to the performance appraisal. The letter rebutted certain of the issues raised in the appraisal. Specifically, Goldschmidt stated that he arrived late to a meeting on only one occasion and that he spent no more time than other attorneys in the department on personal pursuits. (Goldschmidt Aff. Ex. G). Goldschmidt objected to the paragraph addressing his schedule accommodating his religious practices and its "language that veers too close for comfort to religious stereotypes

---

**5.** Defendants submit a reply declaration of White with their own table of employee ratings that appear to differ from plaintiff's table. While plaintiff's table was based on employee reviews submitted as exhibits, defendants submit no supporting documentation with their calculations. For purposes of this motion, I accept plaintiff's calculations.

(*i.e.*, shrewdly looking for what else he could be given but not living up to his end of the deal)." He stated he was "confident that there was no such intent, [but thought] it would be best to remove any possibility of a mistake by deleting the suggestive language." (*Id.*).

After reading the letter, Drillings was no longer optimistic about how things would work out for Goldschmidt at the agencies. (Drillings Dep. at 199). White and Drillings responded by letter dated January 28, 2002, stating their disagreement with Goldschmidt's objections to his appraisal, and that they erred in informing Goldschmidt that he would be re-evaluated in six months. They stated that the agencies' Human Resources Director advised them that Goldschmidt must be re-evaluated in three months. (*Id.* Ex. I). They advised Goldschmidt that "dramatic and expeditious improvement in [his] work performance and conduct ... over the near term" was necessary, otherwise the agencies would have "no alternative but to terminate [his] employment." (*Id.*). The letter concluded:

> In closing, let us make it crystal clear to you that we take strongest exception, both personally and on behalf of the Agency, to the none-too-subtle reference in your letter to religious intolerance and/or discrimination. You, as is the case with all Agency employees, have received reasonable, if not liberal, accommodations from the Agency to practice your religious beliefs, particularly with respect to time and leave. In view of the ongoing time and leave accommodations you personally have received, your observations are disingenuous and patently without merit, and we both are astounded and insulted by them.

(*Id.*).

Following Goldschmidt's appraisal, White and Drillings did not meet with or provide any further feedback or training, nor did they assign Goldschmidt "any new kinds of work (or indeed much of any new work at all) to enable [him] to demonstrate [his] capabilities." (Goldschmidt Aff. ¶ 10). On April 18, 2002, White and Drillings gave Goldschmidt his re-evaluation, containing identical ratings in every category. (*Id.* Ex. J). During that meeting, White and Drillings informed Goldschmidt that his employment was being terminated, effective three months from then to allow Goldschmidt to seek alternative employment. (*Id.* ¶ 25).

Subsequently, at some point after April 18, 2002, Jerome Becker received two phone calls, one of which was from Rabbi Jacob Goldstein, inquiring as to the reasons for Goldschmidt's dismissal. (*Id.* ¶ 28; Becker Dep. 14–16). Goldschmidt did not ask anyone to contact Becker and was unaware the calls had been placed. (Goldschmidt Aff. ¶ 28). On May 8, 2002, Drillings and White told Goldschmidt that his employment was terminated effective May 10, 2002, because he had engaged in "heavy-duty lobbying." (*Id.*). Goldschmidt explained that he had not requested that anyone call Becker, to which Drillings responded with words to the effect of "we don't want to hear any more from your Rabbi friends." (*Id.*).

#### 4. *Other Incidents*

At some point in 2000, Becker approached Goldschmidt in the men's bathroom and told him "that, in his view, Orthodox Jews are intolerant and contemptuous of other Jews." (*Id.* ¶ 8; Goldschmidt Dep. at 273). At some point in 2001, Becker made a similar comment to Goldschmidt in the bathroom. (Goldschmidt Dep. at 280). In December 2001, "during an office Christmas party, employees were asked to state which historical or other person

they would most like to meet." (Goldschmidt Aff. ¶ 8). Goldschmidt selected Reb Nachman of Breslov,[6] and "was subjected to laughter and ridicule for [his] selection." (*Id.*).

### B. Procedural History

Plaintiff filed a charge of discrimination against defendants with the EEOC.[7] On June 18, 2003, the EEOC issued plaintiff a Right to Sue letter. The instant action was filed on September 2, 2003, alleging violations of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"); the New York State Human Rights Law, New York Executive Law § 296; and the New York City Human Rights Law, New York Administrative Code §§ 8–107 and 8–502.

Specifically, the complaint asserts at least four claims: (1) denial of reasonable accommodation of plaintiff's religion; (2) hostile work environment based on plaintiff's religion; (3) termination based on plaintiff's religion and requests for reasonable accommodation; and (4) termination in retaliation for complaining of discrimination.[8] (Compl. at 7–8). The parties engaged in discovery and the instant motion for summary judgment followed. For the reasons set forth below, defendants' motion is granted with respect to plaintiff's denial of reasonable accommodation and hostile work environment claims, and denied with respect to plaintiff's discrimina-

tory termination and retaliatory termination claims.

### DISCUSSION

### A. Summary Judgment Standard

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor to create an issue for trial. *See id.*

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct.

---

**6.** Reb Nachman was a Chassidic master and great-grandson of the founder of Chassidism. *See* www.breslov.org (last visited July 7, 2005).

**7.** In his complaint, plaintiff alleged he filed the charge on November 21, 2002. (Compl. ¶ 30). Neither party mentions the filing of the charge in its moving papers or 56.1 statement, and therefore there is no evidence on the record as to the date of filing.

**8.** The complaint also states that defendants violated state and federal law by "issuing a

performance evaluation which penalized plaintiff for his requests for reasonable accommodation." It is unclear whether plaintiff intended to make a general religious discrimination claim or a more specific denial of religious accommodation claim. Regardless, plaintiff abandons the claim in his opposition to defendants' motion, referring to the negative performance evaluation only as a fact in support of an inference of discrimination, and not as a claim in and of itself.

2505 (citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *Nat'l Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

## B. *Religious Discrimination Claims Under Title VII*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual or otherwise to discriminate against any individual ... because of such individual's ... religion." 42 U.S.C. § 2000e–2(a). An individual's "religion" includes not just religious beliefs, but "all aspects of religious observance and practice," unless the employer demonstrates that it is unable to reasonably accommodate a religious observance or practice "without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). A plaintiff may claim a violation of religious discrimination under Title VII under theories of either denial of reasonable accommodation or disparate treatment. *See, e.g., Cosme v. Henderson,* 287 F.3d 152 (2d Cir.2002) (denial of reasonable accommodation); *Feingold v. New York,* 366 F.3d 138 (2d Cir. 2004) (disparate treatment). A disparate treatment claim, in turn, may be estab-

lished by showing either (1) adverse job action under circumstances giving rise to an inference of discrimination on the basis of religion, or (2) harassment on the basis of religion that amounts to a hostile work environment. *Feingold,* 366 F.3d at 149.

In the instant action, plaintiff alleges discrimination claims under all three theories: denial of reasonable accommodation, hostile work environment, and disparate treatment. I address each claim in turn.

### 1. *Denial of Reasonable Accommodation* [9]

■ Plaintiff apparently has abandoned his claim for denial of reasonable accommodation; he offers no discussion of the claim and applicable law, and omits the claim whenever he lists his remaining claims in his opposition papers. (*See, e.g.,* Pl. Mem. in Opp. at 1) (stating that plaintiff's claims are hostile work environment, termination based on requests for reasonable accommodation, and termination in retaliation).

Even if the claim were not abandoned, it fails as a matter of law. Under Title VII, an employer has an affirmative obligation to "reasonably accommodate ... an employee's ... religious observance or practice," as long as the observance or practice does not impose undue hardship on "the conduct of the employer's business." 42 U.S.C. § 2000e(j); *see also* N.Y. Exec. Law § 296(10); N.Y.C. Admin. Code § 8–107(3). Hence, an employer violates Title VII by refusing to grant a request for a reasonable religious accommodation that would not result in undue hardship on the employer's business, or by disciplining an

**9.** I address all of plaintiffs' Title VII and state and city law claims together because, with some exceptions not relevant here, discrimination claims brought under the New York State Human Rights Law and the New York City Human Rights Law are subject to the same analysis as such claims brought under Title VII. *See Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 n. 2 (2d Cir.2003); *Cruz v. Coach,* 202 F.3d 560, 565 n. 1 (2d Cir.2000).

employee who fails to comply with an employment requirement that conflicts with a bona fide religious belief, practice, or observance. *See Cosme v. Henderson,* 287 F.3d 152, 158 (2d Cir.2002); 42 U.S.C. § 2000e(j).

Here, plaintiff offers no evidence in support of a claim for denial of reasonable accommodation. Plaintiff does not allege that defendants ever actually denied any of his requests to change his schedule or take leave for religious observance. The only religious observance plaintiff alleges he did not make during his employment was his annual pilgrimage to the Ukraine, because he had insufficient leave. (Goldschmidt Aff. ¶ 14). Plaintiff withdrew his request for leave before the agencies decided it, but after White and Drillings told plaintiff "they would not consider this request and that the agencies had no obligation to accommodate" plaintiff's "vacation." (*Id.*). Although White and Drillings might have discouraged plaintiff from taking leave for the pilgrimage, plaintiff withdrew his request for accommodation before the agencies decided it, and before any alleged denial of a reasonable accommodation occurred. Plaintiff's claim for religious discrimination by denial of a reasonable accommodation is dismissed as a matter of law.[10]

## 2. *Hostile Work Environment*

While defendants seek summary judgment with respect to all plaintiff's claims, they offer no discussion of plaintiff's hostile work environment claim; while defendants address plaintiff's factual allegations supporting his hostile work environment claim, they merely group all his discrimination claims under a *McDonnell Douglas* analysis and make no effort to analyze the

claim under the hostile work environment caselaw. Plaintiff similarly fails to acknowledge the standard for a hostile work environment claim, instead arguing he "has stated a prima facie case that he was subjected to a hostile work environment" under a *McDonnell Douglas* analysis. Nevertheless, I conclude that plaintiff's hostile work environment claim fails as a matter of law.

### a. *Applicable Law*

■ To prevail on a hostile work environment claim under Title VII, "a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir.2004) (internal quotations and citations omitted); *see also Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000) (to defeat a summary judgment motion on a claim of racially hostile work environment, "a plaintiff must produce evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment") (internal quotation marks omitted).

The misconduct must be sufficiently severe or pervasive to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive the environment to be abusive. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Additionally, the plaintiff must demonstrate that a specific basis exists for imputing the conduct that created the hos-

---

10. To the extent Goldschmidt claims that he was wrongfully discharged because of his requests for religious accommodation, this claim is treated as part of his termination claim, which is discussed below.

tile environment to the employer. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996).

With respect to the objective showing, a single incident will not suffice unless "extraordinarily severe." *Cruz*, 202 F.3d at 570 (quotation omitted). Further, as the Second Circuit stated in *Patterson v. County of Oneida*, 375 F.3d 206 (2d Cir. 2004):

> The matter of whether the conduct alleged was so "severe or pervasive" as to create "an objectively hostile or abusive work environment," is to be decided based on the totality of the circumstances, in light of such factors as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Id.* at 227 (quoting *Harris*, 510 U.S. at 21, 23, 114 S.Ct. 367). Additionally, "where reasonable jurors could disagree as to whether alleged incidents of ... harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Id.* at 227.

#### b. *Application*

■ In this case, no reasonable juror could conclude that plaintiff's work environment was "permeated with discriminatory intimidation, ridicule, and insult" that was so severe or pervasive as to alter the conditions of his employment. *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (internal quotation omitted).

At the outset, I assume, as I must, that the subjective element of the hostile work environment claim has been satisfied, that is, plaintiff perceived his work environment to be hostile and abusive. (Gold-schmidt Aff. ¶ 8) (plaintiff alleges he encountered "hostility and abuse ... as a result of [his] requests for accommodation"); *see also Powell v. Consol. Edison Co. of N.Y.*, 97 Civ. 2439(GEL), 2001 WL 262583, *14, 2001 U.S. Dist. LEXIS 2706, at *46 (S.D.N.Y. March 13, 2001) ("there can be no dispute that the subjective requirement has been met, since [plaintiff] has clearly stated in sworn testimony that he perceived his working environment to be racially hostile"). Plaintiff has, however, failed to put forth sufficient evidence with respect to the objective element.

Plaintiff offers few specific instances of discriminatory treatment, instead alleging generally that he "was subjected to criticism, ridicule, and derision from defendants ... in response to his requests for religious accommodation." (Pl. 56.1 Statement ¶ A4). Plaintiff does specifically allege that Becker once commented to him that "in his view, Orthodox Jews are intolerant and contemptuous of other Jews," and that during an office holiday party he "was subjected to laughter and ridicule" for stating that the historical figure he would most like to meet is Red Nachman of Breslov. Assuming these allegations are true, they are isolated and not severe or threatening, nor is there evidence that these incidents interfered with his work performance.

In support of his hostile work environment claim, plaintiff repeatedly alleges that there is "a factual question" as to whether the defendants' extensions of plaintiff's probations and the January 2002 negative performance evaluation were "in response to plaintiff's requests for reasonable accommodation." (Pl.'s 56.1 Statement, "Section A 'Hostile Work Environment'" ¶¶ A6–A8). Even assuming arguendo that the extensions of probation and negative performance review were in response to plaintiff's requests for

religious accommodation, they are at most allegations in support of an inference of discrimination, not examples of "intimidation, ridicule, and insult" in support of a claim for hostile work environment. Indeed, plaintiff does not allege that those actions were accompanied by overt acts of insult or harassment based on plaintiff's religion.

Finally, plaintiff's reliance on Drillings's use of the term "Goldschmituel" in an email discussing his schedule is misplaced in a hostile work environment claim; assuming the term is discriminatory, it was not directed at plaintiff, nor did plaintiff learn of its use until the email was produced in discovery in this case. Defendants' motion for summary judgment as to plaintiff's hostile work environment claim is granted.

### 3. Termination Based on Plaintiff's Religion

#### a. Applicable Law

Title VII prohibits dismissal of an employee based on his religion; "religion" includes all aspects of the individual's beliefs and practices that can be reasonably accommodated by the employer. 42 U.S.C. § 2000e(j). Here, plaintiff claims he was terminated on the basis of his religion, including his practices that required reasonable accommodation by defendants.

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met his or her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 119 (2d Cir.1997). Cases brought under Title VII are analyzed pursuant to the three-step test set forth in McDonnell Douglas and refined in later cases. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Raytheon Co. v. Hernandez, 540 U.S. 44, 50, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003); Stern v. Trustees of Columbia Univ., 131 F.3d 305, 311–12 (2d Cir.1997).

With respect to a discriminatory termination claim, a plaintiff must first establish a prima facie case of unlawful discrimination by showing that (1) he is a member of a protected category, (2) he performed his job satisfactorily, and (3) he was discharged (4) under circumstances that give rise to an inference of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII); Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir.1997) (ADEA).

Second, if the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to "articulate a legitimate, clear, specific and nondiscriminatory reason" for the employment decision. Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir.1995); see also Reeves, 530 U.S. at 143, 120 S.Ct. 2097.

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. See id. at 515–16, 113 S.Ct.

2742; *Lanier v. I.B.M. Corp.,* 319 F.Supp.2d 374 (S.D.N.Y.2004).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99–101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *Harris v. City of New York,* No. 03 Civ. 6167(DLC), 2004 WL 2943101, *2, 2004 U.S. Dist. LEXIS 25496 at *6 (S.D.N.Y. Dec. 22, 2004). It is not sufficient, however, for a plaintiff merely to show that he satisfies *"McDonnell Douglas's* minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 153 (2d Cir.2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination on the basis of race or gender or some other impermissible factor. *See id.* at 157; *Connell v. Consol. Edison Co. of N.Y.,* 109 F.Supp.2d 202, 207–08 (S.D.N.Y.2000).

As the Second Circuit observed in *James,* "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove-particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia University–College of Physicians,* 999 F.Supp. 506, 513–16 (S.D.N.Y.1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### b. *Analysis*

At the outset, I assume that plaintiff has made out the *prima facie* case required by *McDonnell Douglas.* Defendants have articulated a legitimate, nondiscriminatory reason for plaintiff's termination, contending that Goldschmidt's "work performance was found below expectations, he repeatedly came to work late, he missed meetings involving Agency staff and meeting with clients of his employer, he was hostile to co-workers, he demonstrated behavior problems, and [he] failed to take advantage of the multiple opportunities to improve." (Def. Mem. at 4). Hence, I proceed directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find discrimination. I do so by evaluating first plaintiff's evidence, then defendants' evidence, and finally the record as a whole, keeping in mind the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." *Stern,* 131 F.3d at 314; *see also Siano v. Haber,* 40 F.Supp.2d 516, 520 (S.D.N.Y.), *aff'd mem.,* 201 F.3d 432, 1999 WL 1295923 (2d Cir.1999).

### i. *Plaintiff's Evidence*

Plaintiff offers, *inter alia,* the following evidence in support of his discriminatory termination claim:

First, plaintiff's probationary period was extended three times, each instance following an accommodation of plaintiff's religion and/or under circumstances giving rise to an inference of discrimination.

Goldschmidt's first accommodation request to allow earlier departures in the Fall on Fridays to observe Shabbat, while granted, was followed one week later by an extension of his probationary period. (Goldschmidt Aff. Exs. B, C). The second extension of probation was preceded by repeated admonitions by White that Goldschmidt's Friday afternoon departures were an imposition on the agency. (Goldschmidt Aff. ¶ 12, Ex. D). The day after Goldschmidt's probation was extended the second time, January 19, 2001, Drillings sent an email to colleagues discussing Goldschmidt's probation and performance, referring to plaintiff in the subject line as "Goldschmidtuel." (O'Reilly Reply Decl. Ex. I). The probationary review sheet effecting plaintiff's third extension of probation, in August 2001, stated that the agencies were "monitoring Mr. Goldschmidt's time and attendance." (Goldschmidt Aff. Ex. F).

Second, the agencies' performance appraisal of Goldschmidt in January 2002 contains references to Goldschmidt's "special needs," in particular his "fairly complicated set of working hours ... [that] receive[ ] periodic adjustment." The appraisal notes Goldschmidt's "shrewd attention to examining what further accommodations he could be given," without fully "liv[ing] up to the deals struck with him." Further, Goldschmidt was given an overall score of 2, significantly lower than his overall average score (3.075) and requiring automatic re-evaluation. Goldschmidt was the only Assistant Counsel given an overall rating lower than his average score.

Third, defendants repeatedly exhibited displeasure with accommodating Goldschmidt's schedule. According to Goldschmidt, White repeatedly admonished him that his early Friday departures were an imposition, expressed unwillingness to change Goldschmidt's schedule, and derid-ed Goldschmidt for changing back to the Fall schedule in 2001. White established a schedule for Goldschmidt in which he actually worked more then 40 hours per week every other week. White responded to Goldschmidt's email in October 2000 discussing his schedule as "finugliated," accusing Goldschmidt of asking "an awful lot" for the Deputy Counsel "to keep track of whether [Goldschmidt is] putting in a regular day," and referring to the "confusing complexity of it all." In spring 2001, Drillings referred to Goldschmidt's annual pilgrimage as "vacation" that the agencies were not required to accommodate.

Fourth, defendants made additional comments reflective of discriminatory animus, including Becker's comment that Orthodox Jews are intolerant and contemptuous of other Jews, and Drillings's comment accompanying defendants' termination of Goldschmidt that the defendants did not "want to hear more from your Rabbi friends."

### ii. *Defendants' Evidence*

Defendants offer, *inter alia*, the following evidence in support of their motion for summary judgment:

First, plaintiff's job performance was poor throughout his employment, as he, *inter alia*, arrived late to work, tended to personal chores during the day, missed meetings, and failed to improve his performance. (Def. 56.1 Statement ¶¶ 71, 78–93).

Second, the reference to plaintiff's schedule and "fairly complicated set of hours" in his 2002 performance appraisal is merely "an observation concerning the schedule," and "make[s] no mention of accommodation for religious observance." (Def. Mem. at 6). Further, his schedule accommodated his therapist appointments and commute, not only his religion. Finally, "the criticism of [p]laintiff's schedule

was that he failed to adhere to it and in no manner questioned the need for accommodation." (*Id.*).

Third, the reference to "shrewd attention" makes no reference to Judaism and is, at most, a stray remark. (*Id.*).

Fourth, the same individuals involved in the decision to fire Goldschmidt—White and Drillings—are the same individuals who made the decision to hire him. (*Id.* at 7; Def. 56.1 Statement ¶ 15).

Fifth, defendants Drillings and Becker, as well as more than 40% of the attorneys in the Legal Unit, including Goldschmidt's immediate supervisor, were Jewish. (Def. 56.1 Statement ¶¶ 3, 7, 19, 13).

Sixth, Goldschmidt's requests for accommodations were always granted. (*Id.* at 10; Def. 56.1 Statement ¶¶ 27, 37, 43).

Seventh, several Jewish attorneys in the unit were accommodated without incident. (*Id.* at 13; Ticker Decl. ¶ 3; Roslyn Decl. ¶ 3; Drillings Decl. ¶ 4; Cooper Decl. ¶ 3).

### iii.  *The Record As a Whole*

■ Considering the evidence as a whole, and resolving all conflicts in the evidence and drawing all reasonable inferences in plaintiff's favor, I conclude that a reasonable jury could find that plaintiff's religion was a motivating factor in his discharge. There is little doubt that defendants were unhappy with plaintiff's schedule, admonishing the imposition it created, making reference in a probation extension to the need to monitor his time and attendance, and following the major Fall schedule change with a probation extension. While defendants maintain that their un-

happiness was not with the aspects of plaintiff's schedule pertaining to religious accommodation but rather his inconsistent and late arrival times, such a factual dispute must be left to the fact-finder. Further, a reasonable jury could conclude that certain of defendants' statements, including calling plaintiff "Goldschmituel" and referring to him as "shrewd," were referencing his religion.

Defendants highlight weaknesses in plaintiff's case, but those arguments must be presented to, and determined by, the ultimate fact-finder in this case, and therefore fail on this summary judgment motion. Defendants' expert on Jewish history submits a declaration explaining that use of "uel" after a name bears no meaning in Yiddish or in American–Jewish culture, such that "Goldschmidtuel" would carry no derogatory implication to a Jewish person. (Stanislawski Decl. ¶ 8). While defendants' expert makes strong points, such evidence must be presented to the jury, which can weigh it against plaintiff's own reasonable argument that defendants' claim that the "uel" was a typo is implausible, and that it does sound like a play on plaintiff's "Jewishness."[11]

Defendants similarly attack plaintiff's emphasis on the use of the word "shrewd" to describe plaintiff, arguing that it is a neutral comment that makes no reference to Judaism. (Def. Mem. at 6; Def. Reply Mem. at 7). While the term "shrewd" makes no overt reference to Judaism, it is a word that is associated with a Jewish stereotype and in the context here a reasonable jury could conclude that it was not a neutral comment.[12]

---

11.  I also note that defendants' expert declaration was submitted for the first time in defendants' reply papers, and therefore plaintiff had no opportunity to rebut with his own expert witness.

12.  An informal "Google" search reveals that "shrewd" and "Jewish" or "Jew" may often be paired together, with a negative connotation. *See also* "Anti–Semitism and Prejudice in America, Highlights from a May 2002 Survey," Anti–Defamation League (including

Defendants argue that the performance appraisal's mention of plaintiff's "special needs" and his "fairly complicated set of hours" was merely "an observation," not a reference to accommodating his religious practices, and that the only criticism was of plaintiff's failure to adhere to the schedule. This also is a matter for the jury. A reasonable jury could conclude that defendants' displeasure with plaintiff's schedule was based, at least in part, on the continual need for accommodation. This is especially so when read in context with White's email, strongly reacting to the "confusing complexity" of plaintiff's schedule; a reasonable juror could understand the email as first complaining of Goldschmidt's irregular, accommodated schedule, and then mentioning his irregular arrival times as an additional problem. (*See* Goldschmidt Aff. Ex. A ("[t]hat would then get me into your irregular arrival times which are themselves a problem")).

Finally, defendants' arguments that the same decision-makers are involved and that the decision-makers are members of the same class fail, at least at the summary judgment stage. First, on the facts as construed in plaintiff's favor, defendants were not aware of Goldschmidt's need for accommodation until after they extended, and Goldschmidt accepted, the offer. *See Feingold v. New York*, 366 F.3d 138, 155 (2d Cir.2004) (even assuming "same actor" inference applies to Title VII actions, it does not apply where there has been a change in circumstances). While defendants steadfastly maintain they were aware of the need before making plaintiff the offer, that is an issue of material fact to be decided at trial.

Second, while Drillings and Becker identify as Jewish, they do not identify as

Orthodox Jewish, do not observe Shabbat, and do not observe as many Jewish holidays as Goldschmidt. Even if considered members of the same general class—Jewish individuals—there is no conclusive presumption that a person will not discriminate against members of his or her own class. *Feingold*, 366 F.3d at 155. In rejecting just such a presumption involving a Jewish employer and employee, the Second Circuit invoked the Supreme Court's admonition that it is unwise to presume people will not discriminate against members of their own group, stating that "[it] is no more reasonable to presume that individuals will not discriminate against practitioners of their own religious faith." *Id.* (citing *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

Similarly, defendants' argument that other Jewish employees have been accommodated fails. While more than 40% of the agencies' lawyers are Jewish (Def. 56.1 Statement ¶ 19), only one other employee is an observant Orthodox Jew. That employee began employment, and presumably established his accommodated schedule, long before White and Drillings were employed by the agencies. (White Reply Decl. ¶ 2; Drillings Decl. ¶ 1; Ticker Decl. ¶ 1). Moreover, he apparently had tenured civil servant status, not vulnerable to probation extensions and discipline in the same way as Goldschmidt. (Pl. Mem. at 12; Drillings Dep. at 28 (testifying to his belief, but not certainty, as to status)).

While plaintiff's claim is far from strong, I simply cannot conclude that no reasonable jury could find that defendants dismissed plaintiff, at least in part, because of his religion and concomitant need for religious accommodation. Defendants' motion

---

among its statements indicating anti-Semitism a description of Jewish people as overly-successful, shrewd businesspeople), *available*

*at* http://www.adl.org/anti_semitism/2002/as_survey.pdf (last visited July 18, 2005).

for summary judgment on this claim therefore is denied.[13]

## C. Retaliation

### 1. Applicable Law

Title VII prohibits an employer from firing an employee in retaliation for having made a charge of discrimination. 42 U.S.C. § 2000e–3(a); *see also* N.Y. Exec. Law § 296(1)(e); N.Y.C. Admin. Code § 8–107(7). "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" *Terry v. Ashcroft*, 336 F.3d 128, 140–41 (2d Cir.2003) (internal citations omitted). To establish a prima facie case of retaliatory discharge, Goldschmidt must show (1) he was engaged in protected activity; (2) defendants were aware of that activity; (3) he was discharged; and (4) there was a causal connection between the protected activity and the termination or suspension. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir.1998); *see Terry*, 336 F.3d at 141 (2d Cir.2003).

The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *See* 42 U.S.C. § 2000e–3; *see also Wimmer v. Suffolk Co. Police Dep't*, 176 F.3d 125, 134–35 (2d Cir.1991). Informal as well as formal complaints constitute protected activity. *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990). Moreover, to establish that his activity is protected, Goldschmidt "need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Sumner*, 899 F.2d at 209; *see also Grant v. Hazelett Strip-*

*Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir.1989).

A plaintiff may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or ... (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000); *see also Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993).

Although the burden that a plaintiff must meet at the prima facie stage is *de minimis*, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins.*, 46 F.3d 196, 204 (2d Cir.1995).

### 2. Application

■ Retaliation claims are similarly governed by the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas*. *Terry*, 336 F.3d at 141 (2d Cir.2003). Again, I assume that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*. Defendants have articulated a legitimate, nondiscriminatory reason for plaintiff's dismissal, contending that Goldschmidt was discharged for poor work performance, arriving late to work, tending to personal chores during the day, missing meetings, and failing to improve his performance. (Def. 56.1 Statement ¶¶ 71, 78–93). Thus, I proceed directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find retaliation.

"All too often ... employers react negatively to the assertion of a claim and conse-

---

**13.** I have considered defendants' other arguments in support of summary judgment on the issue of discriminatory termination and I reject them.

quently turn a weak discrimination case into a strong retaliation case." *Alvarez v. City of New York,* 31 F.Supp.2d 334, 344 (S.D.N.Y.1998); *see also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 762 (2d Cir.1998). That may be what happened here. Plaintiff complained of discrimination on the basis of his religion in his January 14, 2002 letter to defendants, objecting to language he viewed as invoking a religious stereotype in characterizing his handling of his accommodation. (*See* Def. Ex. GG, Goldschmidt letter). Defendants interpreted plaintiff's letter as an accusation of discrimination and reacted strongly, and negatively, to the accusation. (*Id.* Ex. HH, Drillings and White letter, "tak[ing] strongest exception . . . to the none-too-subtle reference . . . to religious intolerance and/or discrimination"). In fact, White stated that his optimism for plaintiff's future at the agencies dimmed after receiving the letter. A reasonable jury could find that defendants' next steps— immediately informing plaintiff his review would occur in only three months, not the six months originally stated; giving plaintiff a review that restated the identical ratings with no explanation whatsoever; and ultimately dismissing plaintiff—were taken, at least in part, because of defendants' strong negative reactions to plaintiff's accusations. A reasonable jury could especially reach such a conclusion in light of defendants' "Goldschmituel" and "shrewd" comments, reasonably construed as religious animus. Defendants' motion for summary judgment on plaintiff's retaliation claim is denied.

## D. *Individual Defendants*

■ Plaintiff's complaint states claims against defendants Becker, White, and Drillings as individuals, for aiding and abetting the agencies' discriminatory ac-

tions, under New York Executive Law § 296(6) and New York City Administrative Code § 8–107(6). Plaintiff also alleges individual liability for all his discrimination claims under New York City Administrative Code § 8–107(1)(a) and (3)(a). Defendants move to dismiss all claims against defendants White, Drillings, and Becker in their individual capacities. For the reasons that follow, the motion for summary judgment on those claims is denied.

Plaintiff has presented sufficient issues of material fact for two of his claims against the agencies to survive summary judgment: termination based on religion and termination in retaliation for complaining of discrimination. As set out above, plaintiff's evidence in support of his surviving claims is based entirely on the comments and actions of the three individual defendants. The plain language of New York City Administrative Code §§ 8–107(1)(a) and 107(7) provides for individual liability of an employee engaged in discrimination and retaliation, respectively. Therefore, defendants' argument against individual liability under City law is rejected.

Under the same facts, plaintiff's claims against defendants Becker, Drillings, and White for aiding and abetting the agencies' discriminatory termination of Goldschmidt survive summary judgment. *See* N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8–107(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."). A reasonable jury certainly could find that Becker, White, and Drillings participated in the agencies' alleged discriminatory actions, given that the three individuals were the proponents of the discriminatory actions

alleged by plaintiff.[14] *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995) ("a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the HRL").

The Court notes that plaintiff has not alleged individual liability under New York Executive Law § 296(1), prohibiting discrimination by an "employer," which may include an employee who has ownership interest or the "power to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984). The Second Circuit has held that an employee may be held individually liable under § 296(6) as an aider and abettor, irrespective of whether he had power to do more than carry out personnel decisions. *Tomka,* 66 F.3d at 1299. The Appellate Divisions of the New York Supreme Court are split on this issue, and the New York Court of Appeals has not decided it. *Chamblee v. Harris & Harris, Inc.,* 154 F.Supp.2d 670, 677 (S.D.N.Y. 2001). Even if an employee must meet the definition of an "employer" set out in *Patrowich* to be individually liable as an aider and abetter, Drillings, White, and Becker all do so. Although the president of the agencies had the ultimate authority to hire and fire employees at plaintiff's level, White and Drillings effectively controlled such determinations, recommending the dismissal of plaintiff. (Def. 56.1 Statement ¶¶ 9, 12). In addition, White and Drillings, independently of the president, controlled probation extensions, employee evaluations, and employee schedules. (*See, e.g.,* Def. Exs. DD–II). Becker, as Chairman of the agencies, surely is not a mere employee without ownership interest or power beyond carrying out others' personnel decisions, but acts as a principal agent of the agencies. *See Hicks v. IBM,* 44 F.Supp.2d 593, 600 (S.D.N.Y.1999).

Defendants' motion for summary judgment as to individual liability on the remaining claims is denied.

### E. *Punitive Damages*

Defendants move for summary judgment as to plaintiff's claim for punitive damages. In their motion, defendants argue that punitive damages are not available against public entities, such as the agencies, under 42 U.S.C. § 1983, or under New York state law. In his opposition, plaintiff agrees with defendants and points out that he claims punitive damages only against the individual defendants—Becker, Drillings, and White—under the City law, which does provide for punitive damages.

Defendants then argue for the first time in their reply that plaintiff has put forth insufficient evidence to support a claim for punitive damages under the malice standard set out for Title VII in *Kolstad v. American Dental Assoc.,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), and as applied by courts in actions for punitive damages under New York City Administrative Code § 8–502. *See, e.g., Umansky v. Masterpiece Int'l Ltd.,* 276 A.D.2d 692, 715 N.Y.S.2d 638, 639 (2d Dep't 2000).

---

**14.** A plaintiff must first show employer liability to sustain a claim for individual liability for aiding and abetting employer discrimination under § 296(6); if a plaintiff cannot show that the employer "encouraged, condoned, or approved" of the employees' alleged discriminatory conduct, any claim for individual liability consequently fails. Defendants argue that plaintiff fails to show that the agencies "encouraged, condoned, or approved" of the individual defendants' discriminatory conduct; this argument fails, because the agencies acted through the same supervisory individuals plaintiff alleges perpetuated the discriminatory conduct. *See Hicks v. IBM,* 44 F.Supp.2d 593, 600 (S.D.N.Y.1999).

Defendants raise this argument for the first time in their reply brief. Therefore, I do not consider it now, *United States v. Gigante,* 39 F.3d 42, 50 n. 2 (2d Cir.1994), but will address it before or at trial after plaintiff has had an opportunity to be heard. Defendants' motion for summary judgment as to plaintiff's claim for punitive damages against the individual defendants is denied.

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part. The parties shall appear for a pretrial conference on August 19, 2005 at 2:00 p.m.

SO ORDERED.